OPINION *Page 2 
{¶ 1} Ritchie Carnes appeals from the trial court's entry of summary judgment against him on his employer-intentional-tort claim against appellee Gordon Food Services, Inc. ("GFS"), and his negligence and product-liability claims against appellee HK Systems, Inc.
 {¶ 2} Carnes advances two assignments of error on appeal. First, he contends the trial court erred in entering summary judgment on his employer-intentional-tort cause of action. Second, he claims the trial court erred in entering summary judgment on his product-liability causes of action.
 {¶ 3} The record reflects that GFS employed Carnes as a maintenance technician at its Springfield, Ohio, distribution facility. He sustained a serious injury on January 3, 2001, when he came in contact with the underside of a moving conveyor belt and had his arm crushed between two rollers. At the time of the incident, Carnes was performing maintenance on the conveyor system, which had been designed and installed by HK Systems. He applied for and received workers' compensation benefits in connection with his injury.
 {¶ 4} On April 4, 2001, Carnes filed suit against GFS and HK Systems asserting a variety of claims, including an employer-intentional-tort cause of action against GFS and product-liability causes of action against HK Systems. After deposing Carnes on July 18, 2003, GFS and HK Systems moved for summary judgment. While their motions were pending, Carnes voluntarily dismissed the lawsuit without prejudice. He refiled the action on November 24, 2004, asserting substantially the same claims. After deposing *Page 3 
Carnes a second time on October 21, 2005, GFS and HK Systems again moved for summary judgment. Based on its review of the parties' briefs and the evidence, the trial court sustained both motions in a July 18, 2006, decision and entry. Relying primarily on Carnes' 2003 deposition testimony, the trial court found that he had caused his injury by touching the moving conveyor belt and that GFS and HK Systems were not liable, as a matter of law, under any of the theories set forth in the complaint. This timely appeal followed.
 {¶ 5} In his first assignment of error, Carnes asserts that the trial court erred in entering summary judgment against him on his employer-intentional-tort claim. Applying the familiar three-part test set forth in Fyffe v. Jeno's, Inc. (1991), 59 Ohio St.3d 115, Carnes contends a trier of fact reasonably could find: (1) that GFS knew it was dangerous for its employees to cross underneath a moving and unguarded conveyor system, (2) that GFS knew with substantial certainty that he would be injured if he were required to cross underneath the moving and unguarded system, and (3) that GFS, despite such knowledge, specifically trained and instructed him to move from one side of the conveyor system to the other side by crossing underneath while it was moving. According to Carnes, his injury occurred while he was attempting to cross underneath the moving conveyor system as he had been instructed and required to do. Therefore, he argues that the trial court erred in entering summary judgment against him on his employer-intentional-tort claim.
 {¶ 6} We review the appropriateness of summary judgment de novo and follow the standards set forth in Civ.R. 56. Koos v. Cent. OhioCellular, Inc. (1994), 94 Ohio App.3d 579, 588. "Pursuant to Civ.R. 56, summary judgment is appropriate when (1) *Page 4 
there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, said party being entitled to have the evidence construed most strongly in his favor." Zivich v. Mentor Soccer Club,Inc. (1998), 82 Ohio St.3d 367, 369-370.
 {¶ 7} To establish "intent" for the purpose of proving that an intentional tort has been committed by an employer, an employee must demonstrate "(1 ) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task." Fyffe, supra, paragraph one of the syllabus. "To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his knowledge of some risk, his conduct may be [characterized as] negligent]. As the probability increases that particular consequences may follow, * * * the employer's conduct may be characterized as [reckless]. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk-something short of substantial certainty-is not intent." Id., *Page 5 
paragraph two of the syllabus.
 {¶ 8} During his October 21, 2005, deposition, Carnes testified that GFS supervisors trained him to crawl underneath the moving conveyor system to get from one side to the other. (Carnes 2005 depo. at 93-94, 96, 101, 107). He also testified that it was necessary to crawl underneath the moving conveyor system to get from one side to the other to "track" the conveyor belt, which is what he was doing at the time of his injury. (Id. at 108-109, 111-112). Carnes additionally denied that he safely could have stepped over the top of the conveyor system to cross it.[1] (Id. at 128-131, 140).
 {¶ 9} Construed most strongly in Carnes' favor, the foregoing testimony might be sufficient to create a genuine issue of material fact as to GFS's liability for an employer intentional tort. The record reflects that the bottom of the conveyor system was only 11 to 14 inches from the ground. If GFS trained, instructed, and required Carnes to crawl under this operating conveyor system, where moving rollers were located, a trier of fact potentially could find the existence of a dangerous procedure and the requisite knowledge on the part of GFS to support an employer-intentional-tort claim.
 {¶ 10} We note, however, that Carnes' 2005 deposition testimony directly conflicts with deposition testimony he gave on July 18, 2003, after the first filing of his lawsuit against GFS and HK Systems. During the 2003 deposition, counsel for GFS questioned Carnes about an interview he had participated in with an OSHA representative shortly after his accident in January 2001. Carnes acknowledged that he *Page 6 
had been truthful when speaking to the OSHA representative and that his answers to the representative's questions had been accurate. (Carnes 2003 depo. at 5-6). Counsel for GFS then played a tape recording of Carnes' interview with the OSHA representative. The interview included the following relevant questions and answers:
 {¶ 11} "Q. How did the accident happen?
 {¶ 12} "A. Approximately 11:30 p.m. I went out to take a look at the tracking on a belt. I was in the process of doing preventative maintenance, and I noted first of all that one of the main drive rollers was off by about a half an inch, and I tightened those and both were about 4-1/8 of an inch, and then I went back to where I tracked the belt and removed the covers and adjusted that tracking roller. And I stuck my hand up underneath there and, just to check the tension. And I had my gloves on, and when the seam came by, it snagged my glove and pulled me in.
 {¶ 13} "Q. Was the machine running?
 {¶ 14} "A. Pardon?
 {¶ 15} "Q. Was the machine —
 {¶ 16} "A. Yeah, yes, it was. It would have been hard to track without the, without it — with it being off, it would have been very hard to move the roller, because this way, it's a 200-foot belt.
 {¶ 17} "Q. Is that the way you were shown?
 {¶ 18} "A. It's a safe, it's a safe procedure. We frequently do them with it on. Six-inch belts you don't have to. But the only way you can see, it's got to be running, so you cross over the top of the conveyor system. (Carnes 2005 depo. at 129). *Page 7 
got to see the belt move side to side. It's normal.
 {¶ 19} "* * *
 {¶ 20} "Q. At this particular time being that you have to track it and see it, you have to have it running, is that why you didn't lock it out?
 {¶ 21} "A. Yeah, yes, that's normal procedure to, I mean it would be, to me, I mean — it's because you can't, you are talking about a 200-foot belt. I'd like to see the man who's able to crank on that and try to track it without, without moving it. You just, you can't, with it stationary. It's just real, real hard because you don't have the momentum of the belt rotating across the roller.
 {¶ 22} "Q. Who's in charge —
 {¶ 23} "A. It's a very, very safe operation, I might add. Very, very safe.
 {¶ 24} "Q. Who's in charge of safety in that area for the company, do you know? For your safety, is it a —
 {¶ 25} "A. We have an extensive program called COACH actually, continually observing another coworker's habits. We don't have a safety director, per se, but we as workers take full responsibility for our actions and the safety and thereabouts, so we, everybody goes through COACH training in order to observe, and we do so many observations per week on the safety of employees. And it's a continuous training program actually. It's one of the best I have ever been in."
 {¶ 26} "* * *
 {¶ 27} "Q. Do you have any other questions for me, any safety concerns?
 {¶ 28} "A. No, no, like I said, I mean, they got a, they have got a really great program implemented in safety, and they — that was my fault what happened. I mean I *Page 8 
shouldn't have, I shouldn't have did what I did, and it was an oversight on my part. But actually belt tracking is a — I mean you are outside of the conveyor, completely outside.
 {¶ 29} "Q. When you track it, are both covers off?
 {¶ 30} "A. Yeah, you take — yeah, you got to take the covers off in order to get to the bolts, but you are not underneath the conveyor, you are on the side, so.
 {¶ 31} "Q. When you were underneath, what were you doing underneath there?
 {¶ 32} "A. I just, I reached up there to try to grab it and pull it and —
 {¶ 33} "Q. To check the tension?
 {¶ 34} "A. Not necessarily to check the tension but to pull it. I mean what I had been doing was taking it and just driving it on the top. As it pulled across the pallet I was just pulling my hand across it and pulling it back. And when that failed, when that failed to work in driving it over, I grabbed it underneath, and when I grabbed it underneath, it caught me.
 {¶ 35} "Q. Your method, has anybody else done it the same way? What's the method —
 {¶ 36} "A. I have seen people do it in a similar fashion, using like hammer handles to pull it from underneath, to pull it on the rollers past, and that's the only thing I have ever seen. I imagine that different people have different ways. But most of the time what I see is grabbing the conveyor on the top and just yanking it, which is very, very safe; you are not going to get hurt doing that. Which is, you know, like I said, what I have been doing, and just, I, you know, complete oversight, I admit that; I shouldn't have did what I did. It's kind of, you know, one of those things where — and it had me before, you know, I even thought about it. I mean it was just like, just like that. *Page 9 
 {¶ 37} "* * *
 {¶ 38} "Q. Now when you are tracking that, I know you have the covers off on both sides, how do you go from one side to the other side to do the
 {¶ 39} "A. Just climb over.
 {¶ 40} "Q. Just climb over?
 {¶ 41} "A. Yeah, just climb straight over.
 {¶ 42} "Q. Is it running at where you can jump over it?
 {¶ 43} "A. Yeah, yeah, it's running. Well, not jump over it, I just kind of straddle it and go over it. * * *" (Carnes 2003 depo. at 6-19) (emphasis added).
 {¶ 44} After listening to the tape recording of the foregoing interview during his 2003 deposition, Carnes once again affirmed that his answers to the OSHA investigator's questions had been truthful. (Id. at 20-21). At that point, Carnes' attorney refused to allow the deposition to continue. He dismissed the lawsuit without prejudice shortly thereafter.
 {¶ 45} Although Carnes now cites his October 21, 2005 deposition to support his ref iled lawsuit, we cannot ignore the content of the July 18, 2003 deposition. As set forth above, Carnes told the OSHA investigator in 2001, and plainly reaffirmed during his 2003 deposition, that belt-tracking with the conveyor system running was necessary and safe because the tracking adjustment bolts were located on the side of the system and not underneath it. Carnes also reaffirmed in his 2003 deposition that any pulling of the belt should have been done from the top, which was safe, or alternatively from the bottom using "hammer handles," which obviates the need for physical contact with the belt. He also reaffirmed his 2001 statements to the OSHA investigator that he should not *Page 10 
have been doing what he did at the time of his injury, that the accident was the result of an oversight on his part, and that it was his fault. Finally, he reaffirmed his earlier statement that the proper way to get from one side of the conveyor system to the other was to straddle it and climb over the top.
 {¶ 46} Insofar as Carnes now contends, based on his 2005 deposition, that the injury occurred when he attempted to cross underneath the operating conveyor system, as he allegedly had been instructed and required to do by GFS supervisors, we find an irreconcilable conflict with his 2003 deposition testimony affirming the truth and accuracy of his 2001 statements to the OSHA investigator. As noted above, during his 2003 deposition, Carnes reaffirmed his prior statement that the proper way to move from one side of the conveyor system to the other was to "kind of straddle it and go over." This admission by Carnes is consistent with deposition testimony from other GFS representatives. For example, GFS safety specialist Lance Buffinga stated that employees were told the proper procedure for crossing the conveyor system was to hold the sides of the bed and simply step over. (Buffinga depo. at 13-14). Likewise, GFS warehousing director Daniel Summerfield stated that employees were to cross the conveyor system by placing one hand on each side of the conveyor and then stepping across one leg at a time. (Summerfield depo. at 64-65).
 {¶ 47} In Byrd v. Smith,110 Ohio St.3d 24, 30, 2006-Ohio-3455, the Ohio Supreme Court recently held "that an affidavit of a party opposing summary judgment that contradicts former deposition testimony of that party may not, without sufficient explanation, create a genuine issue of material fact to defeat a motion for summary judgment." Although Byrd involved an affidavit that conflicted with prior deposition *Page 11 
testimony, we see no reason why the same principle would not apply here. Just as a party cannot use an affidavit to contradict prior deposition testimony, we discern no reason why a plaintiff should be permitted to use more recent deposition testimony to contradict prior deposition testimony, at least absent some plausible explanation for the contradiction. In reaching this conclusion, we note that affidavits and depositions are similar insofar as they both involve sworn statements. One obvious difference between the two is that an affidavit is written whereas a deposition involves oral testimony. For purposes of contradicting prior testimony, however, we find this distinction to be immaterial. Just as in Byrd, Carnes is attempting to create a genuine issue of material fact with a sworn statement that contradicts his prior deposition testimony. This is precisely what Byrd disallows in the absence of a reasonable explanation for the contradiction. Therefore, absent a sufficient explanation for the contradiction between his 2003 and 2005 deposition testimony, Carnes cannot rely on the more recent testimony to avoid summary judgment.
 {¶ 48} During the 2005 deposition, counsel for GFS addressed the conflicting testimony with Carnes as follows:
 {¶ 49} "Q. And is it fair to say, as you testified previously, both in the previous deposition and to the OSHA investigator, that the accident was your fault because you put your hand where you shouldn't have?
 {¶ 50} "A. I don't recall —
 {¶ 51} "MR. ROACH: Objection. Go ahead.
 {¶ 52} "THE WITNESS: I do not recall — when the OSHA inspector came to me, I told him that I did not — he came to me the second, third day in the hospital. I was still on *Page 12 
morphine drip, I couldn't move my arm, I was confined to that bed for almost three or four weeks of my stay in the hospital. I didn't want to talk to him or anybody else.
 {¶ 53} "Q. My question —
 {¶ 54} "A. And I told him so.
 {¶ 55} "Q. My question, Ritchie, would you agree the accident was your fault because you put your hand —
 {¶ 56} "A. I would not agree with that.
 {¶ 57} "Q. So you're disagreeing with your prior testimony?
 {¶ 58} "A. I am saying, sir, that I tried to tell that investigator the truth at that time. I was on morphine at the time, a morphine drip, and I told him that I did not want to talk to him, I just-I did the best of my ability at that time, tell him what I knew.
 {¶ 59} "Q. Okay.
 {¶ 60} "A. Or what I felt. I do not feel that way anymore.
 {¶ 61} "Q. Okay. I played that tape for you at the prior deposition; correct?
 {¶ 62} "A. Yes, you did.
 {¶ 63} "Q. And you affirmed that that was your voice?
 {¶ 64} "A. Yes, I did, sir.
 {¶ 65} "Q. And you affirmed that everything on the tape was accurate?
 {¶ 66} "A. Yes, I did.
 {¶ 67} "Q. Okay. And in that tape, which you have now affirmed twice was accurate, you indicated that you thought it was your fault because you put your hand where you shouldn't have; is that correct? *Page 13 
 {¶ 68} "A. I did say that at that time to that investigator, yes, sir.
 {¶ 69} "Q. And you confirmed that what you said to the investigator was correct-strike that. And you confirmed what you told the investigator was accurate; correct?
 {¶ 70} "A. I confirmed that to the investigator, yes, sir.
 {¶ 71} "Q. You confirmed to me that what you told the accident investigator-that what you told him was correct?
 {¶ 72} "A. Yes, I did, sir.
 {¶ 73} "Q. Okay. You told me that: [']What I said on this tape is accurate[']; correct?
 {¶ 74} "A. I told you that, yes, sir." (Carnes 2005 depo. at 142-144).
 {¶ 75} On appeal, Carnes insists GFS's counsel acted improperly by "bootstrapping" his statements to the OSHA investigator, which he contends were inadmissible hearsay, into his 2003 deposition. He also asserts that his remarks to the OSHA investigator are unreliable because he was in extreme pain and was on morphine at the time of the interview.
 {¶ 76} Neither of the foregoing arguments persuades us that Carnes should be permitted to escape the consequences of his 2003 deposition testimony by controverting it with more recent testimony. As an initial matter, Carnes' responses to the OSHA investigator were not inadmissible hearsay. To the contrary, they were admissible as non-hearsay statements of a party-opponent under Evid.R. 801 (D)(2)(a). Moreover, Carnes expressly affirmed the truth of those statements during his 2003 deposition. As set forth above, during the 2003 deposition, he listened to a tape recording of his interview with the OSHA investigator and confirmed that his answers to *Page 14 
the investigator's questions had been "truthful and accurate." While Carnes may have been in pain and on medication at the time of the OSHA interview, he was not similarly impaired during his 2003 deposition when he ratified his statements to the OSHA investigator. Therefore, he has not provided a sufficient explanation for the irreconcilable conflicts between his 2003 and 2005 deposition testimony. As a result, Carnes cannot rely on the 2005 deposition testimony to establish a genuine issue of material fact as to whether GFS required him to cross under the conveyor system despite knowing that an injury was substantially certain to occur. Because Carnes has not demonstrated a genuine issue of material fact on these aspects of the Fyffe test, the trial court properly entered summary judgment against him.
 {¶ 77} In his appellate brief, Carnes also cites the absence of guards underneath the conveyor system, the alleged existence of an "identical" prior injury, and an affidavit from his expert witness, Dr. Gary Robinson, to support an inference that GFS knew his injury was substantially certain to occur. These arguments fail, however, because they once again rest on the premise — contradicted by Carnes' deposition testimony ratifying his statements to the OSHA investigator — that GFS trained and required him to cross underneath the moving conveyor system. Moreover, contrary to Carnes' assertions, the record lacks evidence from which a trier of fact could find that GFS knew his injury was a substantial certainty due to the lack of guards under the system. During his 2003 deposition, Carnes acknowledged that the work he was performing at the time of his injury did not require him to be under the conveyor system. The belt-tracking process could be performed from the side of the system. As discussed above, Carnes also recognized that the way to cross from side to side was to step over the top of the *Page 15 
conveyor system. Therefore, he has failed to create a genuine issue of material fact as to whether the absence of guards made his injury a substantial certainty. Moreover, the fact that GFS received an OSHA citation following Carnes' injury does not preclude the entry of summary judgment on the intentional-tort claim. See, e.g., Harlan v. UniversalForest Products, Inc., Butler App. No. CA2003-11-293, 2004-Ohio-3915; ]}48; Gertz v. Nerone Sons, Inc., Cuyahoga App. No. 80422, 2002-Ohio-3782; Spates v. Richard E. Jones Associates (July 12, 1995), Montgomery App. No. 15057; Catchings v. Norb Wells ElectronicServices (Oct. 20, 1989), Lucas App. No. L-88-410.
 {¶ 78} Carnes' argument about the existence of an "identical" prior injury is equally unavailing. The other incident involved GFS employee Jason Robinson, who also was tracking a belt at the time of his injury. Unlike Carnes, however, Robinson was working in a different location on a belt that, at its lowest point, was approximately chest high. (Robinson depo. at 7). Robinson explained that it was impossible to cross over the top of this higher belt, and the increased clearance allowed him to "scoot" under it. (Id. at 28-29). Moreover, his injury occurred when his hand slipped off of an adjustment nut, not when he was crossing under the belt. (Id. at 22-23). Robinson testified that he had never seen an employee attempt to cross underneath the approximately 11-inch-high belt where Carnes was working. (Id. at 41). With regard to that lower belt, Robinson stated that the proper procedure was to "put a hand on either side of the belt and you hop your legs over." (Id.). Because the circumstances surrounding Robinson's injury differed significantly from those of the present case, his accident does not support Carnes' intentional-tort claim. The fact that Robinson caught his hand while working on a four-foot-high belt does not support a reasonable inference that GFS disregarded a *Page 16 
substantial certainty that Carnes would be hurt while attempting to crawl under an 11-inch-high belt in contravention of company policy and despite his admitted awareness that the proper way to cross the conveyor was to step over it.
 {¶ 79} Finally, the opinions of Carnes' expert witness, Dr. Gary Robinson, fail to establish a genuine issue of material fact on the intentional-tort claim. In essence, Robinson opined that GFS knew an injury was substantially certain to occur as a result of employees crossing under moving conveyor systems. This opinion, however, does not remedy Carnes' failure to raise a genuine issue of material fact as to whether GFS required him to confront such a risk in the first place. Cf.Crissinger v. Turn-All Machine Gear Co. (May 7, 1999), Clark App. No. 98-CA-108 ("The expert's opinion that injury was substantially certain to occur as a result of her wearing gloves while reaming cannot remedy Crissinger's failure to offer proof that her employer required her to expose herself to that risk."). While Robinson also averred that GFS did require Carnes to cross under the conveyor system, this conclusory averment was not based on any personal knowledge. Moreover, it was contrary to Carnes' own 2003 deposition testimony — which Robinson admitted he had not even reviewed — wherein Carnes ratified his earlier statements to the OSHA investigator about the proper procedure for crossing the conveyor system being to step over it. Therefore, we conclude that Robinson's expert opinion did not create a genuine issue of material fact for trial.
 {¶ 80} In a final argument, Carnes asserts that even if his accident resulted from negligence on his part, an employee's negligence is not a bar to an intentional-tort claim. Be that as it may, GFS was entitled to summary judgment because Carnes' 2001 statements to the OSHA investigator, which he reaffirmed in his 2003 deposition, *Page 17 
contradict his claim that GFS trained and instructed him to go from one side of the conveyor system to the other side by crossing underneath while it was moving. Because Carnes cannot establish a genuine issue of material fact on that element of the Fyffe test, we find no error in the trial court's entry of summary judgment on his intentional-tort claim. Accordingly, we overrule Carnes' first assignment of error.
 {¶ 81} In his second assignment of error, Carnes contends the trial court erred in entering summary judgment on his product-liability causes of action against HK Systems. In support, Carnes provides a two-page argument based on the opinion of his expert witness, Dr. Gary Robinson, and the occurrence of a prior accident at a different location involving a different type of conveyor system designed, manufactured, and installed by HK Systems. Based on this evidence, Carnes asserts that HK Systems improperly failed to install guards on the bottom and sides of the GFS conveyor system, failed to provide a safe and reasonable means to cross the system, and failed to warn workers not to cross under it.
 {¶ 82} Upon review, we find no genuine issue of material fact on any of the foregoing theories. The record reflects that Carnes' injury occurred on January 3, 2001. At that time, R.C. § 2315.20(A) recognized express or implied assumption of the risk as a defense to a product-liability claim.[2] Under the statute, "if it is determined that the claimant expressly or impliedly assumed a risk and that such express or implied assumption of the risk was a direct and proximate cause of harm for which the claimant *Page 18 
seeks to recover damages, the express or implied assumption of the risk is a complete bar to the recovery of those damages."[3] R.C. §2315.20(B)(2).
 {¶ 83} "[I]mplied, or secondary, assumption of the risk encompasses those situations where the defendant owes some duty to the plaintiff, but it is the plaintiffs voluntary consent to or acquiescence in an appreciated, known, or obvious risk to his safety that will act as a defense to the plaintiffs products liability action." Sproles v. SimpsonFence Co. (1994), 99 Ohio App.3d 72, 78. "In essence, the doctrine of implied assumption of the risk does not mean that the defendant did not proximately cause the injury; rather it means the plaintiffs own negligence was so great it supercedes any negligence on the part of the defendant[.]" Knopp v. Dayton Machine Tool Co., Columbiana App. No. 03 CO 60, 2004-Ohio-6817, ]}24. Implied assumption of the risk is an available defense in a product-liability action involving a workplace accident where the injured employee voluntarily exposed himself to the risk at issue and was not required by his employer to do so. Carrel v.Allied Products Corp., 78 Ohio St.3d 284, 290, 1997-Ohio-12.
 {¶ 84} With the foregoing standards in mind, we conclude that HK Systems was entitled to summary judgment on Carnes' product-liability causes of action. Even assuming, purely arguendo, that Carnes has raised a triable issue of fact as to whether *Page 19 
the HK Systems conveyor was defective in one or more of the ways alleged, his implied assumption of the risk precludes recovery as a matter of law. During his 2003 deposition, Carnes affirmed the truth and accuracy of his 2001 statements to an OSHA investigator. Those statements included acknowledgments(1) that belt tracking was a "safe procedure" and a "very safe operation," (2) that belt tracking could be performed without going underneath the conveyor system, (3) that he placed his hand where he "shouldn't have," (4) that the accident was his fault, (5) that the accident resulted from a "complete oversight" on his part, (6) that he "shouldn't have did what [he] did," and (7) that the proper way to cross the conveyor system when tracking a belt is to "just climb right straight over[,] * * * just kind of straddle it and go over it." (Carnes 2003 depo. at 7, 11-12, 16-18). In light of these admissions, we find no genuine issue of material fact as to whether Carnes implicitly assumed the risk by crawling underneath the 11-to-14-inch-high conveyor system and becoming caught in a moving roller. Cf. VanCoppenolle v. Kamco Indus., Inc. (Oct. 31, 1997), Williams App. No. WM-97-004 (affirming the entry of summary judgment against an employee on a workplace product-liability action where the employee admitted "that she knew better than to stick her hand into the airlock and that she had done something very stupid"). The trial court properly concluded, based on Carnes' own admissions, "that he himself caused the accident to occur." (Final Entry, Doc. #39).
 {¶ 85} Finally, insofar as Carnes' arguments on appeal might be grounded in common-law negligence rather than the product-liability statute, we likewise find the trial *Page 20 
court's entry of summary judgment to be proper.[4] With regard to any negligence claims related to HK Systems, the doctrine of implied assumption of the risk merges with contributory negligence, and a comparative-negligence analysis applies. Zigler,165 Ohio App.3d at 324-325. Summary judgment is appropriate where the only reasonable conclusion is that the plaintiffs negligence was greater than the defendant's negligence. Sproles, 99 Ohio App.3d at 79; Scassa v.Dye, Carroll App. No. 02CA0779, 2003-Ohio-3480,1J71; Knopp, supra at ]}39. That is the case here.
 {¶ 86} Carnes' admissions reveal that he knew the underside of the conveyor system was dangerous and that the proper way to cross was to go over it. Moreover, photographs of the conveyor system illustrate the manifest danger and foolishness of attempting to crawl under rather than climbing over the top. As noted above, the conveyor system stood only 11 to 14 inches high. Attempting to pass underneath the moving rollers posed an obvious danger, and Carnes easily could have stepped over the narrow belt. Based on the low clearance under the conveyor, HK Systems vice-president Phillip Kaffenberger opined that warning employees not to cross underneath was unnecessary as it was a matter of common sense. (Kaffenberger depo. at 93). In addition, Carnes acknowledged that the conveyor belt could be tracked from the side of the system. Given that fact, Kaffenberger opined that belt tracking did not expose employees to any hazard and that the underside of the conveyor system was "guarded by location." (Kaffenberger depo. at 41, 55). In other words, the space between the floor *Page 21 
and the frame of the conveyor system "wasn't anything the person normally would come in contact with." The area where Carnes' injury occurred was recessed several inches up into the frame, making it "very difficult to get to." (Id. at 55).
 {¶ 87} Even assuming, arguendo, that Kaffenberger's opinions were wrong and that HK Systems was negligent to some extent, the negligence associated with Carnes' conduct far outweighs any negligence on the part of HK Systems, as a matter of law. Because reasonable minds could only conclude that Carnes' negligence exceeded HK Systems' negligence, the trial court properly entered summary judgment against him. Accordingly, we overrule Carnes' second assignment of error.
 {¶ 88} The judgment of the Clark County Common Pleas Court is hereby affirmed.
WOLFF, P.J., and FAIN, J., concur.
[1] Carnes repeated this assertion in an affidavit attached to his memorandum in opposition to summary judgment, claiming that the top of the conveyor belt was kept full of boxes. When pressed on this issue during his 2005 deposition, however, Carnes conceded that there were times boxes were not present and when it was possible to cross over the top of the conveyor system. (Carnes 2005 depo. at 129).
[2] Although the version of R.C. § 2315.20 discussed herein was repealed the year after Carnes' accident, implied assumption of the risk remains a bar to a product-liability claim. See R.C. 2307.711(B).
[3] "In negligence cases, although express and primary assumption of the risk remain viable defenses, implied assumption of the risk is merged with contributory negligence. * * * Comparative negligence, however, is inapplicable in a products-liability case. * * * This conclusion was codified by the Ohio Legislature in 1987 Am. Sub. H.B. No. 1, which created former R.C. 2315.20 (repealed by 2002 Am. Sub. S.B. No. 120, eff. 4-9-03)." Zigler v. Avco Corp., 165 Ohio App.3d 319, 324-325,2005-Ohio-6130 (citations omitted).
[4] The General Assembly eliminated common-law product-liability causes of action effective April 7, 2005, but such actions were allowed at the time of Carnes' injury. See Routzahn v. Garrison, Montgomery App. No. 21190, 2006-Ohio-3652, ]}61. *Page 1