JOURNAL ENTRY AND OPINION
{¶ 1} Plaintiffs-appellants, the Estate of Michael Merrell, Michael S. Merrell, and Dannette Merrell (as individuals and co-administrators of the Estate), appeal from the judgment of the common pleas court granting the motion for summary judgment of defendant-appellee, M. Weingold 
Company ("M. Weingold") on their intentional tort claim. We reverse and remand.
 {¶ 2} Michael W. Merrell ("the decedent") was employed by M. Weingold as a "burner" on the scrap metal baler at M. Weingold's scrap yard on Campbell Road in Cleveland, Ohio. M. Weingold has two other scrap yards in Cleveland. One is known as the Harry Rock yard; the other is known as the East 91st yard.
 {¶ 3} A scrap metal baler crushes scrap metal into small cubes, otherwise known as bales. Three workers — a crane operator, a burner, and a baler operator-work on the baler. To perform the baling process, the crane operator lifts scrap metal from the ground and puts it on the platform or "table" of the baler. The burner, also known as the "tableman," steps onto the table and removes any non-ferrous metal or other undesirable material from the table and cuts off any "stringers" hanging over the table. When he has finished, the burner steps off the table and stands on a nearby platform or goes into a small shed next to the table. The baler operator, who is located in a control tower some thirty feet above the compression chamber of the baler, then activates the machine's controls to turn the table so it dumps the contents of the table into the compression chamber, also known as the *Page 3 
"box," and then three rams, operating in sequence, compress the scrap metal into a two-foot by four-foot cube. When the cycle is completed, the ejection door opens and the completed bale is pushed through the door down a chute.
 {¶ 4} Periodically, the ejection door will not close all the way. This means either that the "clean-out hole" next to the door has become clogged with dirt and debris or metal has become jammed in the box or in the path of the door. An indicator light on the control panels alerts the baler operator that the door is not closing properly. The baler operator then puts the baler into "pilot pump mode," walks down the tower steps, tells the burner to clean out the hole, and then returns to the tower. It is undisputed that clearing the jam is one of the burner's job duties.
 {¶ 5} In "pilot pump mode," the baler is still on and energized, but the hydraulics to the baler are not activated and presumably the machine will not cycle. "Locking out" the baler, i.e., shutting off the power to the machine completely, takes approximately ten minutes; restarting the baler after it has been shut down and locked out also takes ten minutes. It is undisputed that, prior to the decedent's death, the baler was locked out only when maintenance workers performed major repairs on the machine, even though, as Gordan Jermstad, vice-president of operations at M. Weingold testified, it would have been possible to lock out the baler before clearing a jam. Jermstad explained that the machine was locked out for maintenance "to ensure that the work is done safely" and "it's more fool proof with the lock out." *Page 4 
 {¶ 6} Daniel Schwarzer, baler operator foreman on M. Weingold's Campbell Road baler for 16 years, testified that to clear the clean-out hole, the burner would pull the dirt and debris out with a hoe or rake. According to Schwarzer, there was "no reason" for the burner to be in the doorway of the compression chamber when cleaning out the hole because the burner could use his hoe.
 {¶ 7} Michael S. Merrell, the decedent's father, worked at M. Weingold for 14 years as a truck driver. In his affidavit, which was proffered by appellants as an exhibit to their brief in opposition to M. Weingold's motion for summary judgment, he contradicted Schwarzer's claim. Merrell averred that he would make made deliveries to the Campbell Road site and would observe the baler while he was waiting for his truck to be unloaded. Merrell averred that there were "many times" when he saw the burner on the baler enter the box through the top and then crawl out through the ejection door and that he had seen the burner, including his son, go into the path of the ejection door when cleaning out the hole.
 {¶ 8} The deposition testimony in the record established that to clear jammed metal from the box, the burner would sometimes have to get in the box or stand in the doorway. Cedric Darby, who worked as a burner on the Campbell Road baler for five years, testified that he would sometimes climb into the box and cut jammed metal out with a torch. He testified further that he had been in the box "plenty of times to unstick rams and stuff like that." Michael Baker, crane operator on the Campbell Road baler for ten years, testified that he would sometimes help clear *Page 5 
blockages at the baler door and that "several times over the years," he would have to get in the path of the doorway to clean out a piece of metal. Schwarzer, who worked with the decedent for one year and trained him on his job as a burner, likewise testified that he saw the decedent cross the threshold of the door "a couple of times" and reach into the box to get a piece of metal out. Rather than instructing the decedent not to enter the compression chamber, Schwarzer told him that he "didn't like it" because the baler's main pumps were still operational.
 {¶ 9} Similarly, Robin Koenig, who has worked at M. Weingold for 25 years and is now the yard supervisor at the company's main location on East 91st Street, testified in deposition that in 2000, he operated the Campbell Road baler to fill in for Schwarzer. According to Koenig, he got in the box several times to torch bales that were stuck inside the baler.
 {¶ 10} In addition to metal getting jammed in the box, ice would sometimes freeze in the path of the ejection door during the winter. Keith Wilfong, a crane operator at the Campbell Road site who sometimes filled in as a burner, testified that in either 2000 or 2001, he was working as a burner when the door became jammed. Wilfong testified that he waved his hands at baler operator Schwarzer to let him know that he was going into the compression box, then he jumped from the table into the compression chamber and picked at the ice until it chipped off.
 {¶ 11} It is undisputed that the baler operator, who controls the baler operations and sits in a tower 30 feet above the box, cannot see the burner as he is *Page 6 
clearing jammed metal from inside the box or the clean-out hole by the door of the compression chamber. Schwarzer testified that he would wait until he saw the burner get back up on the platform before he would turn the baler on again; Darby testified that his "agreement" with the baler operator was that he should not start the machine up again until he saw him climb back into the shed next to the baler.
 {¶ 12} Schwarzer trained Peter Gonzalez to work as his replacement baler operator when he was on vacation for several weeks each year. Schwarzer told Gonzalez to "make sure your tableman's up on the table" before restarting the baler after the burner had cleared a jam, but Gonzalez testified that there was no "set rule" for how the burners would let him know they were done; he simply "assumed" that he would see the burner when he was done with his task. According to Gonzalez, some burners would climb back next to the table after completing the task, but he would see others walking to the bathroom and "guess" they were done clearing the jam. Other times, Gonzalez would leave the tower and look for the burner.
 {¶ 13} Schwarzer testified that, in the 17 years he worked as a baler operator at M. Weingold, there were never any safety meetings or written manuals regarding how to use the baler safely. Similarly, Gonzalez testified that he had never seen or heard of any safety manuals regarding the baler and there were never any meetings regarding safe use of the baler. Baker likewise testified that no one trained him regarding a safe way to clear a jam; he just did it "whatever way's the easiest." *Page 7 
 {¶ 14} On December 3, 2004, the decedent was working as a burner on the Campbell Road baler with Gonzalez (who was substituting for Schwarzer) and crane operator Baker. At approximately 11:40 a.m., Gonzalez manually opened the ejection door, then turned the power to the baler off and instructed the decedent to clear a jam at the ejection door. Gonzalez saw the decedent proceed to the baler door area. At noon, Gonzalez opened the door to the pump room, so the workers, including the decedent, could clock out for a half-hour lunch. Gonzalez then returned to the tower, where he ate his lunch. At 12:30 p.m., the workers returned from lunch and the decedent continued clearing the jam at the ejection door. Gonzalez, speaking to another employee in the control tower, and without locating the decedent's position, turned the baler power back on, and closed the ejection door on the decedent, crushing his skull and killing him.
 {¶ 15} On December 21, 2004, appellants filed a complaint against M. Weingold, alleging that the decedent had died as the result of an employer intentional tort. The trial court, without opinion, subsequently granted M. Weingold's motion for summary judgment. Appellants timely appealed, asserting two assignments of error:
 {¶ 16} "I. The trial court erred in granting defendant-appellee's motion for summary judgment because genuine issues of material fact exist as to whether M. Weingold Co. was liable for an employer intentional tort. *Page 8 
 {¶ 17} "II. The trial court erred in granting defendant-appellee's motion for summary judgment because plaintiffs-appellants set forth evidentiary facts establishing a prima facie case of employer intentional tort."
1. Summary Judgment Standard
 {¶ 18} Civ.R. 56(C) provides that summary judgment is appropriate when: 1) there is no genuine issue of material fact, 2) the moving party is entitled to judgment as a matter of law, and 3) after construing the evidence most favorably for the party against whom the motion is made, reasonable minds can reach only a conclusion that is adverse to the nonmoving party. Zivich v. Mentor Soccer Club, Inc. (1998),82 Ohio St.3d 367, 369-370; Temple v. Wean United, Inc. (1977),50 Ohio St.2d 317, 327. We review the trial court's judgment de novo, using the same standard that the trial court applies under Civ.R. 56(C). Grafton v.Ohio Edison Co. (1996), 77 Ohio St.3d 102, 105.
2. Employer Intentional Tort
 {¶ 19} While Ohio's workers' compensation scheme provides employees with the primary means of compensation for injury suffered in the scope of employment, an employee may institute a tort action against the employer when the employer's conduct is sufficiently egregious to constitute an intentional tort. Sanek v. Duracote Corp. (1989),43 Ohio St.3d 169, 172. When an employer's conduct constitutes an intentional tort, the employer's act occurs outside the scope of employment and, thus, the employee's recovery is not limited to the workers' compensation provisions. *Page 9 Blankenship v. Cincinnati Milacron Chemicals, Inc. (1982),69 Ohio St.2d 608, 613, fn. 7.
 {¶ 20} In Fyffe v. Jeno's, Inc. (1991), 59 Ohio St.3d 115, paragraph one of the syllabus, the Ohio Supreme Court set forth a three-part test for proving an employer intentional tort.[1] "In order to prove an employer intentional tort, the plaintiff must show that the employer knew of the danger present in the workplace, knew that exposure to the danger meant that harm to an employee was a `substantial certainty,' and acted to require the employee to continue to perform the task despite the danger and substantial certainty of harm." Costin v. Consol. CeramicProd., Inc., 151 Ohio App.3d 506, 2003-Ohio-437, atT|11, quotingFyffe, supra.
 {¶ 21} Construing the evidence in a light most favorable to appellants, we find that the trial court erred in granting summary judgment to M. Weingold because there are genuine issues of material fact regarding each prong of the Fyffe test.
 A. M. Weingold's knowledge of danger in the workplace *Page 10 
 {¶ 22} First, the evidence demonstrates an issue of fact regarding whether M. Weingold knew that its employees were entering the baler's compression chamber, when the machine was not locked out, to clear jammed metal. Schwarzer's deposition testimony was that he had seen the decedent reach into the compression chamber a "couple of times" to get a piece of metal out. Darby, who worked on the Campbell Road baler for five years, testified that he would sometimes climb into the box to cut out jammed metal. Additionally, he testified that he had been in the box "plenty of times to unstick rams." Likewise, yard supervisor Koenig testified that when he operated the Campbell Road baler, he got in the box several times to get a bale unstuck.
 {¶ 23} Furthermore, construing the evidence in a light most favorable to appellants, there is a genuine issue of material fact regarding whether M. Weingold knew that its employees were crossing the threshold of the ejection door while clearing the clean-out hole. Despite M. Weingold's assertion that no one went inside the box or crossed the baler door threshold to clear the clean-out hole, Schwarzer, the Campbell Road baler operator foreman for 16 years, testified that he had seen the decedent cross the threshold of the door twice. Additionally, Baker, the crane operator, testified that "several times over the years," he had gotten in the path of the doorway when clearing out the hole. Specifically, Baker testified as follows:
 {¶ 24} "Q. How would it be jammed that you would have to go down there? *Page 11 
 {¶ 25} "A. If the door don't close, there's a hole that the stuff falls out of the bottom. If a big piece could get in there and it got wedged in there — it all depends. There's no way of saying it any different.
 {¶ 26} "Q. Okay. But sometimes to get those things out, you'd have to be in the doorway, the actual doorway?
 {¶ 27} "A. If it was easier."
 {¶ 28} Similarly, the decedent's father averred that he had seen burners, including his son, go into the path of the ejection door when clearing the clean-out hole.
 {¶ 29} Since the baler operators (Schwarzer, Gonzalez, and Koenig at various times) acted as site foremen, there is evidence that M. Weingold, through its agents, knew of a dangerous condition in the workplace.
 {¶ 30} M. Weingold argues, however, that dangerous work is different from an otherwise dangerous condition within that work, and an employer must have knowledge of the dangerous condition that caused the employee's injury before liability for an intentional tort can attach. See, e.g., Wallace v. Shelly and Sands, Inc., Belmont App. No. 04 BE 11,2005-Ohio-1345, at T|22. Specifically, M. Weingold contends that baling, by its nature, is dangerous work, and there was no dangerous condition on the baler that was not a "natural hazard" of baling scrap metal.
 {¶ 31} We disagree. A reasonable juror could find that M. Weingold knew that its employees were entering the compression chamber and/or crossing the threshold *Page 12 
of the ejection door when the baler was not locked out, and it also knew that locking out the machine was the only foolproof way to avoid injury when someone was clearing the doorway of the machine, especially because the baler operator was not able to see the burner as he cleared the jams. Thus, the danger was not merely working on the baler; the dangerous condition was clearing jams and the clean-out hole when the baler was not locked out. M. Weingold also contends that to establish the first element of the Fyffe test, an employer must have "actual knowledge of the exact dangers which ultimately caused the injury," and there is no evidence that it knew that the decedent would cross the threshold of the ejection door while clearing a jam in the doorway because he had been "trained" to use a hoe to clear such jams. Again, we disagree.
 {¶ 32} Although M. Weingold contends that its burners, including the decedent, had been trained not to cross the threshold of the door and to use a hoe or shovel to clear the clean-out hole when the door was jammed, it cites no specific training given to any of its employees, including the decedent, about how to safely clear a jam. It is undisputed that prior to the decedent's death, M. Weingold conducted no safety meetings for its employees and did not distribute any safety manuals regarding safe operation of the baler. Moreover, Baker specifically testified that he had not been trained on a safe way to clear a jam and just did it "whatever way's the easiest." Likewise, Darby testified that he received no training from M. Weingold about how to do his job as a burner. Moreover, although Schwarzer testified that he "trained" the *Page 13 
decedent regarding clearing the door, Schwarzer's deposition contains no evidence regarding what he specifically told him. Accordingly, a reasonable juror could conclude that burners at M. Weingold, including the decedent, were not adequately trained regarding how to safely clear a jam in the baler when the door would not close properly.
 {¶ 33} Therefore, we find the evidence presented by appellants sufficient to create a genuine issue of material fact regarding M. Weingold's knowledge of a dangerous condition in the workplace.
B. Substantial Certainty of Injury
 {¶ 34} "To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his knowledge of some risk, his conduct may be negligence. Where the risk is great and the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk — something short of substantial certainty — is not intent."Van Fossen v. Babcock Wilcox Co. (1988), 36 Ohio St.3d 100, paragraph six of the syllabus. *Page 14 
 {¶ 35} M. Weingold argues that it was not "substantially certain" that injury to the decedent would occur while he was clearing a jam on the baler because there had been no prior accidents or close calls where a burner placed himself in the path of the ejection door and the baler operator failed to ascertain the burner's location before closing the door.
 {¶ 36} As this court stated in Brown v. Pkg. Corp. of America (Jan. 11, 2001), Cuyahoga App. No. 77709, however:
 {¶ 37} "[T]he lack of prior accidents is not dispositive.
 {¶ 38} "`Simply because people are not injured, maimed, or killed every time they encounter a device or procedure is not solely determinative of the question of whether that procedure or device is dangerous and unsafe. If we were to accept the [employer's] reasoning, it would be tantamount to giving every employer one free injury for every decision, procedure or device it decided to use, regardless of the knowledge or substantial certainty of the danger that the employer's decision entailed. This is not the purpose of Fyffe. It is not incumbent that a person be burned before one knows not to play with fire.'" Id., quoting Cook v. Cleveland Elec. Illum. Co. (1995), 102 Ohio App.3d 417,429-430.
 {¶ 39} "Thus, in determining whether an employer had knowledge that a dangerous procedure would be substantially certain to cause injury, the focus is not on how many prior accidents had occurred, but rather on the employer's knowledge *Page 15 
of the degree of risk involved." Id., citing Taulbee v. Adience, Inc.,BMI Div. (1997), 120 Ohio App.3d 11, 21.
 {¶ 40} In Schwotzer v. Stone Container Corp., Cuyahoga App. No. 82511, 2003-Ohio-4658, an employee brought an action for intentional tort against his employer when his hand was crushed while he was attempting to clear a jammed machine after a co-worker, who could not see the employee and was also trying to clear a jam near his position on the machine, "jogged" the machine and powered it back on. In assessing the employer's knowledge of the degree of risk involved, this court stated, "[a] reasonable juror could question how one person can start the machine while another is clearing a jam or why the workers were unable to see or communicate with each other while clearing the jams." Accordingly, this court found a genuine issue of material fact regarding the employer's knowledge of the "substantial certainty" of injury, and held, therefore, that the trial court had erred in granting the employer's motion for summary judgment.
 {¶ 41} Likewise, in Logan v. Birmingham Steel Corp., Cuyahoga App. No. 80472, 2003-Ohio-5065, this court held that the employee had presented sufficient evidence to withstand the employer's motion for summary judgment where there was testimony that employees were trained to remove cobbled steel during production when the equipment was in "local/manual mode" but not locked out, even though the equipment was locked out whenever the maintenance or service departments would work on it. In light of this evidence, this court found that reasonable minds could *Page 16 
conclude that the employer knew that injury to employees while removing cobbled steel from a dangerous machine, while it was not locked out, was substantially certain to occur.
 {¶ 42} Here, it is undisputed that the burner was expected to clear the ejection doorway when the door would not close. Furthermore, it is undisputed that the baler was not locked out when a jam was being cleared, even though it was always locked out when major maintenance was performed on it. It is also undisputed that the compression chamber and the ejection door were extremely dangerous when not locked out. Finally, it is undisputed that the baler operator, who controlled the machine's operations, could not see the burner as he cleaned out the hole or cleared jammed metal from the box, and there was no "set rule" for determining when the burner had completed his task before the operator restarted the baler.
 {¶ 43} Accordingly, as in Schwotzer and Logan, reasonable minds could conclude that M. Weingold was aware that injury to the decedent was substantially certain to occur when he was clearing material jams on the baler while it was not locked out.
 {¶ 44} Moreover, "an employer's failure to comply with safety regulations is a relevant consideration in determining the employer's knowledge of substantial certainty of injury." Logan, supra, citingAnderson v. Zavarella Bros. Constr Co. (Dec. 5, 1996), Cuyahoga App. No. 70657. A company's knowledge, prior to the subject accident, that it is in violation of OSHA standards, may be a factor in proving *Page 17 
an intentional tort. Thomas v. Barberton Steel Iron, Inc. (Apr. 1, 1998), Summit App. No. 18546.
 {¶ 45} Attached to appellants' brief in opposition to M. Weingold's motion for summary judgment were copies of OSHA investigations and citations showing that M. Weingold had been the subject of various investigations in the ten years prior to the decedent's death. In 1995, OSHA issued citations to M. Weingold based on several inspections during March 1995 at its East 91st yard. This site did not have a baler (as the Harry Rock and Campbell Road sites did), but it contained heavy mechanical equipment capable of being locked out. Within the case file from OSHA with regard to this inspection and citations was a document entitled "Lock-Out/Tag-Out Written Program for M. Weingold Company." The document states, "[t]he accidental or unexpected starting of any machinery or electrical equipment can cause injury or death." It then continues:
 {¶ 46} "Machinery being inspected or repaired must be isolated from all potentially hazardous energy sources, which must be locked-out and tagged-out. The machinery must also be free from all residual or accumulated energy before employees may perform any servicing or maintenance activities, if the unexpected release of stored energy could cause injury."
 {¶ 47} The document further provides that training in the "safety significance of the lock out (or tag out) procedures as well as how to use those procedures" is to be *Page 18 
done by the "Assistant Foreman." The name "Bob," handwritten, appears next to the words "Assistant Foreman."
 {¶ 48} Also included in the OSHA investigation file was a "Safety Policy" that included various "Job Safety Analysis" forms. One such form was for "Operating a Hydraulic Horizontal Baler" and included the following instruction for "maintenance or clearing jams" on the baler:
 {¶ 49} "Advise crane operator to stop delivering scrap. Baler operatorto shut down and lock out main power controls." (Emphasis added).
 {¶ 50} This evidence suggests that, as early as 1995, M. Weingold recognized the need for a lock out/tag out program for clearing jams on its balers. The evidence also suggests, however, that despite its apparent recognition of the need for such a program, M. Weingold never implemented any program. The OSHA inspector apparently recognized as much, stating in his narrative regarding the citations:
 {¶ 51} "On 3/15/95, I returned to the scrap yard to review records and conduct the closing conference. I met with Mr. Margolis [identified earlier in the report as M.Weingold's V.P. of Sales] and Jerry Crowder. Mr. Margolis handed me several safety programs which had been copied from an OSHA Compliance Guide issued by H. Ray Kirk Co. I pointed out that although names were entered in forms for Lockout, Bloodborne Pathogens, and Respirator Programs, that did not mean that the programs were complete or implemented." *Page 19 
 {¶ 52} Robin Koenig, who has been yard supervisor at the East 91st site since 1985, identified himself as the "Bob" at the East 91st site in 1995. He testified that he had never seen the "Lock out/Tag out Written Program" prior to his deposition and, further, that he was not even told of a "lock out/tag out" program at M. Weingold until May 2005, after the decedent's death. Furthermore, as noted earlier, all the workers on the Campbell Road and Harry Rock balers testified that they had never received written safety instructions regarding operation of the baler.
 {¶ 53} In October 2004, five weeks before the decedent was killed on the Campbell Road baler, OSHA again was summoned to investigate M. Weingold. At that time, OSHA investigators visited M. Weingold's Harry Rock site and issued the following violation:
 {¶ 54} "29 CRF 1910.147(c)(1): As of 10/29/04, the employer did not have a lock out program implemented for employees servicing or performing maintenance on machines, such as, but not limited to, bailers (sic)."
 {¶ 55} James Hubach, safety foreman responsible for OSHA compliance at the Harry Rock site, confirmed that he and Jermstad met with the OSHA inspector in October 2004 and were told that M. Weingold should have written lock out/tag out procedures. He also confirmed that as of December 2004, when the decedent was killed, there was no written lock out/tag out procedure at the Harry Rock site and no safety manuals regarding how to safely operate the baler had been provided to *Page 20 
employees. When he was asked how the workers on the baler knew how to operate it safely, Hubach responded that "it's just common sense."
 {¶ 56} We find this evidence more than sufficient to create an issue of fact regarding M. Weingold's knowledge of the substantial certainty of injury to the decedent as he cleared material jams from the baler when the machine was not locked out. A reasonable juror could find, in light of this evidence, that M. Weingold knew it was only a matter of time before someone was injured or killed.
 {¶ 57} Contrary to M. Weingold's argument, the fact that these citations and violations were for the Harry Rock baler and the East 91st site, rather than the Campbell Road baler, is not significant.
 {¶ 58} In Richie v. Rogers Cartage Co. (1993), 89 Ohio App.3d 638, an employee was severely burned using a flammable solvent to clean out the tank of a truck. The employer used a very different — and safer — method of cleaning out its truck tanks at a different location, but failed to give the first employee information about the solvent, educate him on how to safely use the product, or provide him with the proper environment in which to use the product. The court found that the employer's utilization of a different method at its other location indicated knowledge on its part as to the proper method for using the solvent. Accordingly, it held that the trial court erred in granting the employer's motion for summary judgment because a reasonable juror could have found that the employer knew that injury to those *Page 21 
employees who were not instructed in the proper method of using the solvent was substantially likely to occur.
 {¶ 59} We find this case akin to the situation in Richie. The evidence suggests that M. Weingold was aware that its workers should lock out and tag out the balers before clearing jams. Accordingly, a reasonable juror could conclude that M. Weingold knew that injury was substantially likely to occur to employees on its Campbell Road baler, who were not instructed that they should lock out the machine before clearing a jam.
 {¶ 60} We reject M. Weingold's argument that OSHA citations are not admissible to show intent. In Hernandez v. Martin Chevrolet, Inc.
(1995), 72 Ohio St.3d 302, 303, the Ohio Supreme Court held that evidence of an employer's OSHA violation did not constitute negligence per se, reasoning that Congress did not intend OSHA to affect the duties of employers owed to those injured during the course of their employment. In Cross v. Hydracrete Pumping Co., Inc. (1999),133 Ohio App.3d 501, fn.1, this court, citing Hernandez, likewise noted that an OSHA violation might present evidence of negligence, but is not dispositive on the issue of an intentional tort. More recently, inLogan, supra, this court noted that an employer's violation of OSHA regulations was a "factor to be considered in determining if the injury to [the employee] was substantially certain to occur." As inLogan, we find that although OSHA violations are not per se evidence of an intentional tort, they are one of many factors to be considered in determining an employer's intent in an intentional *Page 22 
tort action. See, also, Medina v. Harold J. Becker Co., Inc.,163 Ohio App.3d 832, 2005-Ohio-5438, at T|42 (OSHA violations could be considered as factor in determining employer's intent where they were not the only evidence of intent proffered by employee and employee did not argue violations constituted negligence per se); Haldeman v. CrossEnterprises, Inc., Delaware App. No. 04-CAE-02011, 2004-Ohio-4997, at T|36 (OSHA citations are not per se evidence of an intentional tort, but may be relevant to the issue of intent); Neil v. Shook, Inc. (Jan. 16, 1998), Montgomery App. No. 16422 (OSHA violations standing alone are not determinative but only "one of many factors to be considered.").
3. "Required" to Perform the Dangerous Task
 {¶ 61} With respect to the third prong of the Fyffe test, M. Weingold argues that appellants presented no evidence that it required the decedent to place himself in the baler door threshold to clear the jam. M. Weingold asserts that on the day of the accident, the decedent had not been asked to cross the threshold of the ejection door, but only to clear the clean-out hole, which he could have done safely with a rake or hoe.
 {¶ 62} We are not persuaded. Gonzalez's deposition testimony indicated only that the doorway needed to be cleared because it was "plugged;" there was no testimony that anyone, including Gonzalez, knew what had caused the door to jam, or what the decedent needed to do to clear the jam. *Page 23 
 {¶ 63} "Evidence of an act by the employer to require the employee to perform the dangerous task as part of his assigned job duties is sufficient to satisfy this condition." Taulbee, supra, at 24, citingFyffe, supra, at 116 ("As part of his job duties, Fyffe was required to clean conveyor belts used in appellee's production process.") "A jury question is created if there is sufficient evidence `that the employer merely expected the employee to engage in the dangerous task.'"Costin, supra, 2003-Ohio-437, at T|16, quoting Gibson v. DrainageProds., Inc., 95 Ohio St.3d 171, 177, 2002-Ohio-2008. "Moreover, an employer is responsible for acts of its employees that are `calculated to facilitate or promote' the employer's business." Id., quotingStephens v. A-Able Rents Co. (1995), 101 Ohio App.3d 20, 29.
 {¶ 64} Jermstad testified that clearing material jams on the baler was one of the burner's job duties. Moreover, it is undisputed that burners were expected to clear the jams while the baler was not locked out. Accordingly, appellants have presented sufficient evidence to create a material issue of fact regarding whether M. Weingold required the decedent to perform the dangerous task that led to his death.
 {¶ 65} Because we find sufficient evidence to create a jury question regarding each prong of the Fyffe test, we hold that the trial court erred in granting M. Weingold's motion for summary judgment on appellants' intentional tort claim.
 {¶ 66} Appellants' first assignment of error is sustained.
 {¶ 67} In their second assignment of error, appellants contend that the trial court erred in granting M. Weingold's motion for summary judgment "because *Page 24 
plaintiffs-appellants set forth evidentiary facts establishing a prima facie case of employer intentional tort."
 {¶ 68} Appellants did not move for summary judgment on this issue, nor did the trial court decide it; hence, we will not reach that issue here.
 {¶ 69} Appellants' second assignment of error is overruled.
Reversed and remanded.
It is ordered that appellants recover from appellee costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate be sent to the common pleas court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
COLLEEN CONWAY COONEY, P.J., and KENNETH A. ROCCO, CONCUR
[1] Effective April 7, 2005, the Ohio legislature enacted R.C.2745.01, governing an employer's liability for intentional tort, in another attempt "to supersede the effect of the Ohio Supreme Court decisions" in various cases regarding common law employer intentional tort claims, including Fyffe. (See Johnson v. BP Chemicals, Inc.,85 Ohio St.3d 298, 1999-Ohio-267 (holding prior Ohio legislation superseding the decision in Fyffe to be unconstitutional)). R.C. 2745.01
now provides that in an action for intentional tort, an employee must prove that "the employer committed the tortious act with the intent to injure another or with the belief that the injury was substantially certain to occur." R.C. 2745.01(B) defines "substantial certainty" to mean "that an employer acts with deliberate intent to cause an employee to suffer an injury, a disease, a condition, or death." Because the accident at issue occurred prior to the enactment of the statute, this case is governed by the standard set forth in Fyffe. *Page 1