MEDINA, Appellant,

v.

HAROLD J. BECKER COMPANY, INC. et al., Appellees, et al.

[Cite as *Medina v. Harold J. Becker Co., Inc.*, 163 Ohio App.3d 832, 2005-Ohio-5438.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–050041.

Decided Oct. 14, 2005.

834

Mary Jill Donovan, Rene B. Heinrich, Michael P. McCafferty, and Donovan Law, for appellant.

Rendigs, Fry, Kiely & Dennis, L.L.P., Carolyn A. Taggart, Felix J. Gora, and Robert J. Thumann, for appellee Harold J. Becker Company, Inc.

Buckingham, Doolittle & Burroughs, L.L.P., Andrew W. Owen, and Kimberly Cocroft, for appellee Garcia Labor Company.

---

MARK P. PAINTER, Judge.

{¶ 1} This author, at least, in ten years on this court, has not voted to reverse a summary judgment entered in favor of an employer in an intentional-tort case. But there is a first time for everything.

{¶ 2} Plaintiff-appellant Guillermo Medina fell over 30 feet to the ground while working as a roofer. Medina was working under the supervision of defendant-appellee Harold J. Becker Company, Inc., and had been leased to Becker by defendant-appellee Garcia Labor Company. Medina sued both Becker and Garcia for an employer's intentional tort. The trial court granted summary judgment in favor of both Becker and Garcia, and Medina now appeals. We affirm the summary judgment for Garcia, but reverse the entry of summary judgment in favor of Becker.

## I. Fall from the Roof

{¶ 3} Medina is a Mexican citizen who has worked in the United States since 1999. Medina was employed through Garcia, a temporary agency that provided low-skilled laborers to its clients. Through Garcia, Medina began working for Becker in July 2000.

{¶ 4} In July 2002, Becker began work under a roofing contract at the University of Cincinnati Genome Research Institute on Reading Road in Cincinnati. During the first week of work, Medina and other Becker workers removed the stone tile roof from one of the buildings. They then began installing insulation for a new roof. To install the insulation, a crane would lift bundles of insulation onto the roof, and Medina and another worker would catch the bundles. The two men would then unhook each bundle from the crane and roll the insulation to the area of the roof where it would be installed.

{¶ 5} On the morning of his fall, Medina and another worker received a bundle of insulation, with Medina on the side of the bundle nearest the edge of the roof. No workers saw what happened, and Medina has no memory of the incident, but apparently Medina fell between 30 and 35 feet from the roof to the ground below. He suffered permanent disabling injuries.

{¶ 6} Both Medina and Tom Bailey, the Becker foreman, testified that there was a warning line on the roof. The warning line, according to the Occupational Safety and Health Administration ("OSHA"), should have been six feet from the edge of the roof.

{¶ 7} Bailey testified in his deposition that he set up the warning line on the first day of the project. According to Bailey, every workday after that, he rechecked the line, using a tape measure to ensure that it was the appropriate distance from the edge. He testified that the warning line was six feet from the edge at the time that Medina fell.

{¶ 8} In his deposition, Medina was asked whether he remembered that the yellow warning line was six feet from the edge of the roof. Medina answered, "I remember the yellow line, but I don't know exactly that it was exactly six feet away."

{¶ 9} In his affidavit, Medina stated that he had helped Bailey install the warning line on the first day of the project. He claimed that they did not measure the distance from the edge, but simply placed the line by view. He also stated that in the days before he fell when they were removing the old roof, the warning line was moved closer to the edge of the roof to accommodate a large metal box into which the workers placed the old roof's stone tiles. Medina stated that the warning line was sometimes only "a few centimeters" from the edge. Other parts of the warning line were then less than one to two feet from the edge of the roof.

{¶ 10} Medina further stated in his affidavit that while removing the stone tiles, he and other workers worked beyond the warning line. At one point, when Medina and the others were working beyond the warning line, Bailey noticed somebody new coming onto the roof and told him, "Don't do that they are watching us."

{¶ 11} After Medina fell, Tim Lakoff, vice president of the general contractor, Oberle and Associates, went up on the roof and took several photographs of the area where Medina was before he fell. The photographs showed a bundle of insulation with the warning line flush against it. As the warning line continued past the bundle, it was farther away from the edge of the roof. In essence, the photographs showed that the warning line was bowed out closer to the edge of the roof at the place where the insulation was.

{¶ 12} James Zucchero, a consultant in the occupational safety and health field and a former OSHA compliance officer, testified in his deposition that the photographs clearly showed that the warning line was less than six feet from the edge of the roof. In his affidavit, Zucchero stated that the fact that the insulation was placed in an area where Medina had to walk around it with less than four feet between the edge of the insulation and the edge of the roof made his fall a substantially certain outcome.

{¶ 13} After Medina's fall, OSHA investigated the worksite and issued three citations to Becker for serious violations. One of the violations was because the warning line was less than the required six feet from the edge of the roof. Becker eventually settled out of court with OSHA, paying penalties for the citations.

## II.  Employer's Intentional Tort

{¶ 14} In his first assignment of error, Medina argues that the trial court erred when it granted summary judgment in Becker's favor. In his second assignment of error, he argues that summary judgment in Garcia's favor was also in error.

{¶ 15} We review a grant of summary judgment de novo.[1]  Becker and Garcia were entitled to prevail on their summary-judgment motions only if (1) there was no genuine issue of material fact;  (2) they were entitled to judgment as a matter of law;  and (3) it appeared that reasonable minds could come to but one conclusion when viewing the evidence in favor of the party opposing the motion, and that conclusion was adverse to the party opposing the motion.[2]

{¶ 16} Medina's claim against both Becker and Garcia was for an employer's intentional tort.  The test for proving such a tort is set forth by the Ohio Supreme Court in *Fyffe v. Jeno's, Inc.*[3]  In *Fyffe,* the court held that to establish intent by an employer against an employee, the employee must demonstrate the following:  "(1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation;  (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty;  and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task."[4]

---

1.  See *Doe v. Shaffer* (2000), 90 Ohio St.3d 388, 390, 738 N.E.2d 1243.

2.  See *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241.

3.  *Fyffe v. Jeno's, Inc.* (1991), 59 Ohio St.3d 115, 570 N.E.2d 1108.

4.  Id. at paragraph one of the syllabus.

{¶ 17} The *Fyffe* court further clarified that the employee must present proof beyond that required to prove negligence or recklessness.[5] Proving merely the employer's knowledge and appreciation of a risk will fall short of establishing that there was a substantial certainty that injury would occur.[6]

## III.   Becker Summary Judgment

{¶ 18} Regarding Becker, Medina argues, among other things, that a genuine issue of material fact remains concerning whether Becker knew that an injury was substantially certain to occur. Specifically, Medina argues that it remains a disputed fact whether the warning line was less than the required six feet from the edge of the roof. Based on that, he further argues that reasonable minds could conclude that a warning line less than six feet from the edge of a 30-foot drop made Medina's fall a substantial certainty.

{¶ 19} The elements of an employer's intentional tort may be demonstrated by direct or circumstantial evidence.[7] Medina's evidence, if believed, showed that in the days before his fall, the warning line was placed without being measured; that the workers, in order to remove the old roof, had to work outside of wherever the warning line was, sometimes within a few centimeters of the edge of the roof; and that when the workers were being observed, they were then, and only then, instructed by the Becker foreman to follow the safety guidelines.

{¶ 20} Furthermore, in support of his argument that the warning line was placed less than six feet from the edge of the roof, Medina relies on several pieces of evidence. Medina testified in his deposition that he was not sure that the warning line was six feet from the edge. Zucchero, Medina's expert witness, testified that the photographs taken soon after the fall showed that the warning line was less than six feet from the edge. And the photographs showed that the insulation bundles themselves were less than six feet from the edge of the roof after Medina fell, and all who testified agreed that Medina was working between the insulation and the edge of the roof right before he fell. And finally, the OSHA investigation resulted in three serious citations against Becker, one of which was for the warning line being less than six feet from the edge of the roof.

{¶ 21} Though the Becker foreman, Bailey, testified that the warning line was measured always to be six feet from the edge of the roof, we conclude that Medina presented enough evidence, if believed, to demonstrate that an issue of

---

5.   Id. at paragraph two of the syllabus.

6.   Id.

7.   See *Hannah v. Dayton Power & Light Co.* (1998), 82 Ohio St.3d 482, 485, 696 N.E.2d 1044.

fact remains concerning where the warning line was. Therefore, summary judgment was improperly granted in Becker's favor.

{¶ 22} We now turn to Becker's arguments that some of Medina's evidence was inadmissible and that even if there was a disputed fact about where the warning line was, it was not a material fact.

## IV. Affidavit and Deposition

{¶ 23} Becker first argues that Medina's affidavit should not have been considered for summary-judgment purposes because it contradicted his prior deposition. Becker further argues that because Medina's affidavit should not have been considered, Zucchero's conclusions, which relied in large part on Medina's affidavit, should also not have been considered.

{¶ 24} We have previously held, "When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of any material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." [8] The logic behind this rule is based upon the lack of credibility inherent in a conflicting affidavit and the notion that a party should not be allowed to create its own issues of material fact.[9]

{¶ 25} We have also held that the later affidavit must explain inaccurate deposition testimony or reveal newly discovered evidence to be considered.[10] In a later case, we held that an affidavit does not contradict a deposition if it supplements the earlier testimony.[11]

{¶ 26} In sum, if Medina's affidavit explained, supplemented, or clarified his earlier deposition, then it was not in conflict with his deposition. If the affidavit did not conflict, then it could be considered to create genuine issues of material fact sufficient to defeat a motion for summary judgment.

{¶ 27} Becker points out that Medina was asked in his deposition whether he had ever stepped outside the yellow warning line when he was on the roof and that Medina said he had not. Medina continued, "I knew that I wasn't supposed to cross that line because I never crossed it."

---

8. *Bullock v. Intermodal Transp. Services, Inc.* (Aug. 6, 1986), 1st Dist. No. C–850720, 1986 WL 8519.

9. See *Linder v. Am. Natl. Ins. Co.*, 155 Ohio App.3d 30, 2003-Ohio-5394, 798 N.E.2d 1190, at ¶ 14.

10. *Bullock,* supra.

11. *Harmon v. Belcan Eng. Group, Inc.* (1997), 119 Ohio App.3d 435, 695 N.E.2d 783, at fn. 3.

{¶ 28} Becker asserts that this directly contradicted Medina's affidavit. In his affidavit, Medina stated, "When we initially started tearing out the stone tiles from the roof top, it was necessary for me and other roofers to work past the warning line near the edge of the roof by going under the warning line. At this time, I was expected to remove the tiles that were located on the roof, including the ones that were located between the warning line and the edge of the roof. * * * As a matter of fact, no one thought twice about us working outside of the warning lines until Tom Bailey noticed somebody new coming onto the roof and told us, 'don't do that they are watching us.'" Medina continued in his affidavit, "In order to pick up many of the tiles, we often had to go under the warning line to get the tiles that lined the edge of the roof. * * * [Bailey] never told us to not go past the warning line except for one time when he told us to quit immediately because, 'They are coming.'"

{¶ 29} While Medina's affidavit contradicted his earlier deposition testimony about whether he had ever worked outside the warning line, this single contradiction was not enough to negate the entire affidavit. The key issue of fact was not whether Medina had stepped outside the warning line, but where the warning line was. And on that issue, the deposition and affidavit did not conflict. Instead, Medina's affidavit supplemented and explained his earlier deposition testimony.

{¶ 30} The only mention of the placement of the warning line in the deposition was Medina's statement that he remembered the yellow line but that he did not know whether it was exactly six feet away from the edge of the roof. That was a vague statement. In his affidavit, he explained that he and Bailey never actually measured the distance when placing the warning line. He then supplemented his vague statement that the line was not exactly six feet from the edge with specific instances when it was a few centimeters from the edge and when it was one to two feet from the edge.

{¶ 31} We conclude that Medina's affidavit, while possibly in contradiction to his deposition on the issue whether he had ever worked outside of the warning line, sufficiently explained and supplemented the deposition on the more important issue of how far from the edge the warning line was. Medina might very well have been inside the warning line when he fell, but if the warning line was close to the edge of the roof, perhaps even within a few centimeters, it would have offered him little to no protection from a fall.

{¶ 32} Having determined that Medina's affidavit explained and supplemented his deposition and that it was properly before the trial court, we turn to the issue of Zucchero's deposition and affidavit. Becker argues that Zucchero lacked personal knowledge of Becker's awareness at the time of Medina's fall. Becker

also asserts that Zucchero improperly relied on Medina's affidavit and on OSHA records. These arguments are without merit.

{¶ 33} Zucchero stated in his deposition that his conclusion that Becker knew that Medina's fall was a substantially certain outcome was based on Medina's affidavit, the Oberle photographs of the area right after the fall, and the OSHA citation for improper placement of the warning line.

{¶ 34} It has long been the rule in Ohio that "[o]pinion testimony by an expert witness must be based upon facts within the witness' own personal knowledge or upon facts shown by other evidence." [12] We have already determined that Medina's affidavit was properly a part of the record. The Oberle photographs were properly in the record, and as we will discuss in the next section, all OSHA records were properly considered as part of the record. Therefore, Zucchero's opinion testimony was based upon facts shown by the evidence, and that testimony could be relied on for summary-judgment purposes.

{¶ 35} We conclude that Medina's affidavit and Zucchero's report and testimony could have created genuine issues of material fact and were properly before the trial court.

## V. OSHA Records

{¶ 36} Becker next argues that past OSHA violations and the OSHA violations resulting from the investigation of Medina's fall could not have been considered by the trial court in assessing the intentional-tort claim. Numerous Ohio courts have discussed this issue, resulting in a split of authority.

{¶ 37} The Sixth Appellate District has held that an OSHA citation is irrelevant to the employer's intent. [13] More recently, in *Vermett v. Fred Christen & Sons Co.*, [14] the Sixth Appellate District refused to consider OSHA citations, relying on the Ohio Supreme Court's decision in *Hernandez v. Martin Chevrolet, Inc.* [15] In *Hernandez*, the court held that an employer's violation of an OSHA requirement did not constitute negligence per se, reasoning that Congress did not

---

12. *State v. Chapin* (1981), 67 Ohio St.2d 437, 21 O.O.3d 273, 424 N.E.2d 317, paragraph two of the syllabus; *Burens v. Indus. Comm. of Ohio* (1955), 162 Ohio St. 549, 55 O.O. 436, 124 N.E.2d 724, paragraph one of the syllabus.

13. *Heyman v. Stoneco* (Aug. 2, 1991), 6th Dist. No. 90WD071, 1991 WL 355203.

14. *Vermett v. Fred Christen & Sons Co.* (2000), 138 Ohio App.3d 586, 603, 741 N.E.2d 954; see, also, *Duncan v. Mosser Constr., Inc.*, 6th Dist. No. L–04–1364, 2005-Ohio-4020, 2005 WL 1845265.

15. *Hernandez v. Martin Chevrolet, Inc.* (1995), 72 Ohio St.3d 302, 649 N.E.2d 1215.

intend OSHA to affect the duties of employers owed to those injured during their employment.[16]

{¶ 38} The Eighth Appellate District has refused to consider OSHA citations in an intentional-tort claim against an employer,[17] yet it has also held that there was no error in the admission of OSHA violations and an OSHA investigation file in the trial of an intentional-tort claim.[18]

{¶ 39} The Second Appellate District has held that OSHA violations, by themselves, are not enough to demonstrate that an employer intended to injure an employee.[19] But it has also held that while OSHA violations standing alone may not be determinative, the violations "are only one of many factors to be considered."[20]

{¶ 40} Other courts have consistently held that OSHA violations can be considered as one of many factors when determining an employer's intent in an intentional-tort action. For example, the Fifth Appellate District has held, "We find that OSHA citations are not per se evidence of an intentional tort, although under certain circumstances they may be relevant to the issue of intent."[21] The Fourth Appellate District has held, "Failure to comply with safety regulations is relevant to show that an employer required an employee to perform a dangerous task, knowing of the substantial certainty of injury."[22] And the Fourth Appellate District has further noted that a safety violation "may be some evidence of any or all of the *Fyffe* factors."[23] A more recent Fourth Appellate District case has concluded that an employer's violation of an OSHA regulation did not by itself demonstrate that the employer knew an injury to the employee was a substantial certainty, but the court acknowledged that failure to comply with safety regulations could be relevant to show such knowledge.[24]

---

16. Id. at 303, 649 N.E.2d 1215.

17. *Cross v. Hydracrete Pumping Co., Inc.* (1999), 133 Ohio App.3d 501, 728 N.E.2d 1104, fn. 1.

18. *Felden v. Ashland Chem. Co., Inc.* (1993), 91 Ohio App.3d 48, 61–62, 631 N.E.2d 689.

19. *Fleck v. Snyder Brick & Block* (Mar. 16, 2001), 2nd Dist. No. 18368, 2001 WL 256279; *Floyd v. Master Industries, Inc.* (Dec. 10, 1999), 2nd Dist. No. 1489, 1999 WL 1127395.

20. *Neil v. Shook, Inc.* (Jan. 16, 1998), 2nd Dist. No. 16422, 1998 WL 12678.

21. *Haldeman v. Cross Enterprises, Inc.*, 5th Dist. No. 04–CAE–02011, 2004-Ohio-4997, 2004 WL 2260597.

22. *Slack v. Henry* (Dec. 1, 2000), 4th Dist. No. 00CA2704, 2000 WL 33226197.

23. *Patton v. J & H Reinforcing & Structural Erectors, Inc.* (Dec. 9, 1994), 4th Dist. No. 93–CA–2194, 1994 WL 693929.

24. *Shreve v. United Elec. & Constr. Co., Inc.*, 4th Dist. No. 01CA2626, 2002-Ohio-3761, 2002 WL 1677491, at ¶ 75.

{¶ 41} In addition, the Twelfth Appellate District has in two cases reversed a grant of summary judgment for an employer when the employee offered evidence of OSHA citations along with an expert opinion stating that the employer knew that the injury was substantially certain to occur.[25]

{¶ 42} We conclude that because Becker's OSHA violations were not the only evidence Medina presented to demonstrate Becker's intent, and because Medina is not arguing that the violations constituted negligence per se, any OSHA violations by Becker, before Medina's fall or resulting from the OSHA investigation of Medina's fall, could be considered as factors in determining Becker's intent.

{¶ 43} Thus the OSHA records were properly before the trial court, and they bolster the assertion that genuine issues of material fact remain unresolved in Medina's claim against Becker.

## VI. Placement of Warning Line Was a Material Fact

{¶ 44} Finally, Becker argues that the placement of the warning line at the time of Medina's fall was not a material fact. Becker contends that even if the warning line was indisputably less than six feet from the edge of the roof at the time of Medina's fall, Medina's claim for an intentional tort still failed. Not so.

{¶ 45} In essence, Becker argues that even if the warning line was close to the edge of the roof, Medina's fall was still not a substantial certainty. While a substantial certainty is a high bar for a plaintiff to demonstrate, it is not impossible. And for summary-judgment purposes, Medina had only to show that reasonable minds could reach different conclusions regarding whether his fall was a substantial certainty.

{¶ 46} In *Busch v. Unibilt Industries, Inc.*,[26] an employee fell eight feet to a concrete floor. Though the employer provided a safety cable that a falling employee could have attempted to grab, the court reversed the entry of summary judgment for the employer, in part because the employer failed to install a safety device that would have prevented the employee's fall.

{¶ 47} The court noted that whether any harm was a substantial certainty depended on the probability of its occurrence. It then cited numerous other cases in which courts had held that the harm resulting from a fall was a

25. *Dirksing v. Blue Chip Architectural Products, Inc.* (1994), 100 Ohio App.3d 213, 219–221, 653 N.E.2d 718, and *Miltenberger v. Exco Co.* (Nov. 23, 1998), 12th Dist. No. CA98–04–087, 1998 WL 812910.

26. *Busch v. Unibilt Industries, Inc.* (Sept. 22, 2000), 2nd Dist. No. 18175, 2000 WL 1369891.

substantial certainty "because of the very nature of the causes which produce a fall." [27]  Stated the court, "So long as the Earth rotates on its axis, the law of gravity is certain.  While the law of gravity prevails, it is also certain that an unsupported object will fall until its travel is interrupted by some object or surface below.  When the falling object is a human being, harm resulting from the fall is a substantial certainty." [28]

{¶ 48} Similarly, in *Lear v. Hartzell Hardwoods, Inc.*, the court reversed the entry of summary judgment for an employer when the employer offered no fall-protection devices to employees, and an employee fell 20 feet to a concrete floor.[29] The court held that the employee was put "at a direct risk of harm from falling from an elevated height.  This is a risk from which a reasonable mind could find that resulting harm is a substantial certainty, not just a matter of high risk." [30]

{¶ 49} In *Dirksing v. Blue Chip Architectural Products, Inc.*,[31] an employee fell to his death when there were no safety devices in place at the time of his fall. The employer argued that it did not know that it was required to supply fall protection to the employee.  The court reversed the summary judgment granted in favor of the employer, holding that "reasonable minds could differ as to whether [the] employer knew that an injury was substantially certain to occur." [32]

{¶ 50} And in *Emminger v. Motion Savers, Inc.*,[33] an employee fell 40 feet to his death while working on a crane with no safety equipment.  The employer did not deny that it had violated safety regulations, that it had been cited by OSHA for its violations, or that it had violated its own safety protocol.  Instead, the employer contended that it was unaware of a particular OSHA regulation and that the industry custom was not to wear safety devices while working on cranes, even though substantial evidence indicated that the employer knew that it was required to supply fall protection to the employee.

{¶ 51} The employer also argued that the worker's fall was not a virtual certainty at the time of the accident.  This court noted, "[T]he test is not whether

---

27.  Id.

28.  Id.

29.  *Lear v. Hartzell Hardwoods, Inc.*, 160 Ohio App.3d 478, 2005-Ohio-1907, 827 N.E.2d 840.

30.  (Citation omitted.)  Id. at ¶ 17.

31.  *Dirksing v. Blue Chip Architectural Products, Inc.* (1994), 100 Ohio App.3d 213, 653 N.E.2d 718.

32.  Id. at 221, 653 N.E.2d 718.

33.  *Emminger v. Motion Savers, Inc.* (1990), 60 Ohio App.3d 14, 572 N.E.2d 257.

the employer knows that the very event will occur at a precise time. The test is whether the employer knows 'that the consequences are certain, or substantially certain, to result from his act and still goes ahead.'"[34] We held, "Although an employer, without safety controls, may not be virtually certain that a particular employee will fall from a crane on a given date, it is reasonable to infer that an employer should have knowledge that if an employee falls from a height of forty feet, serious injury is a virtual certainty when the employee does not have a lifeline as required by OSHA."[35]

{¶ 52} In this case, Becker does not dispute that it was required to provide a warning line six feet from the edge of the roof as a fall-protection device. Its argument that even if it failed to provide such a device, Medina's fall was not a substantial certainty belies logic and attempts to negate the very purpose and importance of the safety regulations.

{¶ 53} Clearly, the six-foot distance was designed not only to warn workers as they neared the edge of the roof, but also to give workers a chance to avoid a fall should they have lost their balance. It was equally clear that a worker falling over 30 feet off a roof would be seriously injured.

{¶ 54} Becker knew that it was required to provide the warning line six feet from the edge of the roof and understood the importance of providing fall protection to its employees. We conclude that whether Becker provided the warning line at the appropriate location at the time that Medina fell was a material fact, in that reasonable minds could have concluded that a failure to provide a properly placed warning line meant that Medina's fall and subsequent injury was a substantial certainty.

{¶ 55} Therefore, given that genuine issues of material fact remain, we hold that summary judgment was improperly granted in favor of Becker, and we sustain Medina's first assignment of error.

### VII. Loaned Servant—Garcia Properly Exonerated

{¶ 56} Though genuine issues of material fact remain concerning Medina's claim against Becker, we reach a different conclusion regarding Garcia. Because of the loaned-servant doctrine, Garcia did not have the same responsibility as Becker did for Medina's safety.

{¶ 57} Under the loaned-servant doctrine, when one party lends its employee to another for a particular employment, the employee, for anything

---

**34.** Id. at 18, 572 N.E.2d 257, quoting *Pariseau v. Wedge Products, Inc.* (1988), 36 Ohio St.3d 124, 128, 522 N.E.2d 511.

**35.** *Emminger,* supra, 60 Ohio App.3d at 18, 572 N.E.2d 257.

done in that employment, must be dealt with as the employee of the one to whom he has been loaned.[36]   Though the employee remains the general servant of the party who has loaned him, "[s]ince the question of liability is always predicated upon some specific act of the servant, it is not important whether he remains the servant of the general employer as to matters generally, but whether, in performing the act in question, he is acting in the business of and under the direction of the general employer or that of the temporary employer." [37]

{¶ 58} Under the loaned-servant doctrine, Garcia could not be liable for an employer's intentional tort if, at the exact time of the fall, Becker had the power to control and direct Medina.[38]

{¶ 59} The undisputed facts indicated that at the time of Medina's fall, he was working under the control and direction of Becker.  Medina reported to Bailey, the Becker foreman, and, in fact, was the only Garcia employee at the job site on the day that he fell.  Becker acknowledges that it was responsible for providing a general fall-protection plan to the general contractor, Oberle, and that it provided classroom roofing-safety training to Medina.

{¶ 60} Medina was only a general employee of Garcia.  Garcia paid Medina his wages and has been responsible for providing Medina with workers' compensation coverage since his fall.  But Garcia's business was only to provide laborers to its clients.  Garcia did not perform roofing work.  It was of no legal import that the party who loaned the employee continued to pay him as long as the borrowing party controlled the employee in the work performed.[39]

{¶ 61} At the time of his fall, Medina clearly was working under Becker's control.  Therefore, Garcia could not have been liable for an employer's intentional tort, and summary judgment was properly granted for Garcia.

{¶ 62} In *Columbus v. Tradesmen Internatl., Inc.*, the Tenth Appellate District came to the same conclusion upon similar facts.[40]   In *Columbus*, an electrical contractor used temporary workers supplied by an employee-leasing company. The city charged the employee-leasing company with violations of a city code for performing electrical work without an electrical contractor's license.  The court

---

36.   See *Halkias v. Wilkoff Co.* (1943), 141 Ohio St. 139, 25 O.O. 257, 47 N.E.2d 199, paragraph four of the syllabus.

37.   Id. at 152–153, 25 O.O. 257, 47 N.E.2d 199.

38.   Id. at 152, 25 O.O. 257, 47 N.E.2d 199.

39.   See *Baird v. Sickler* (1982), 69 Ohio St.2d 652, 655, 23 O.O.3d 532, 433 N.E.2d 593.

40.   *Columbus v. Tradesmen Internatl., Inc.* (Feb. 4, 1997), 10th Dist. Nos. 96APC06–758 and 96APC06–762, 1997 WL 52905.

held that under the loaned-servant doctrine, the employees performing the electrical work were employees not of the employee-leasing company, but of the electrical contractor.

{¶ 63} The employee-leasing company paid the employees' wages and maintained workers' compensation insurance on the workers. But more importantly, the workers reported to the contractor's superintendent and were under the exclusive direction and control of the contractor while on the job. Based on those facts, the court concluded that the employee-leasing company was not required to obtain a license for the workers.

{¶ 64} Because Medina reported to Becker and was under the exclusive direction and control of Becker while working as a roofer, Medina was an employee of Becker at the time that he fell. Therefore, Garcia, as a matter of law, could not have been held liable for an employer's intentional tort.

{¶ 65} Accordingly, we affirm the entry of summary judgment in favor of Garcia and overrule Medina's second assignment of error. But the summary judgment for Becker is hereby reversed, and this cause is remanded for further proceedings only on Medina's claim against Becker.

Judgment affirmed in part
and reversed in part,
and cause remanded.

Doan, P.J., and Hendon, J., concur.