[Cite as *Dazley, Admr. v. Mercy St. Vincent Med. Ctr.*, 2018-Ohio-2433.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Rebecca L. Dazley, Administratrix

Court of Appeals No. L-17-1304

Appellant

Trial Court No. CI0201603933

v.

Mercy St. Vincent Medical Center, et al. **DECISION AND JUDGMENT**

Appellees

Decided: June 22, 2018

* * * * *

Martin W. Williams, for appellant.

Jean Ann S. Sieler and Kayla L. Henderson, for appellees.

* * * * *

**MAYLE, P.J.**

**{¶ 1}** In this accelerated appeal, plaintiff-appellant, Rebecca L. Dazley,

Administratrix of the Estate of Daryl D. Dazley, Sr., Deceased ("Dazley"), appeals the

November 21, 2017 judgment of the Lucas County Court of Common Pleas, granting

summary judgment in favor of defendants-appellees, Nicholas A. Boraggina, M.D. and

his employer, Mercy St. Vincent Medical Center (collectively, "Dr. Boraggina"). For the reasons that follow, we reverse the trial court judgment.

## I. Background

{¶ 2} On the afternoon of October 2, 2012, 53-year-old Daryl Dazley experienced an irregular heart rate and elevated blood pressure and began coughing up pink foam. Mr. Dazley had experienced similar symptoms in May of 2012, ultimately leading to a cardiac arrest. His past medical history was significant for stroke, dyslipidemia (elevated cholesterol), coronary artery disease, hypertension (high blood pressure), and diabetes. He underwent a cardiac catheterization and placement of a stent in his left anterior coronary artery in August of 2012, and placement of a dual chamber pacer and defibrillator the following month.

{¶ 3} Mr. Dazley contacted his cardiologist's office, then called EMS. He was transported to the St. Vincent emergency department ("E.D."). When he arrived in the E.D., shortly before 3:30 p.m., he was evaluated by attending physician, Sara Graber, M.D., and resident, Nicholas Boraggina, M.D. Drs. Graber and Boraggina recognized that Mr. Dazley was critically ill. His oxygen saturation was initially 84 percent and during treatment, he became hypotensive. Their impression was that Mr. Dazley was suffering from pulmonary edema, congestive heart failure, and cardiogenic shock.

{¶ 4} Drs. Graber and Boraggina were concerned that Mr. Dazley may have been suffering an ST-elevation myocardial infarction ("STEMI"), a heart attack characterized by a complete blockage of the coronary artery. If this was the case, an emergent cardiac

2.

catheterization would need to be performed to relieve the blockage and prevent death of heart muscle. To explore this potential diagnosis, Dr. Graber ordered three EKGs during Mr. Dazley's course in the E.D.

{¶ 5} The first EKG was performed at 3:24 p.m. Dr. Graber interpreted this EKG to show a sinus tachycardia. She did not interpret it as showing ST elevations or arrhythmias. The second EKG was performed at 3:40 p.m. Dr. Graber believed this EKG to be of poor quality because there was "a wandering baseline," making it difficult to interpret. She did, however, see a sinus tachycardia as well as some findings that were concerning for ST elevations in leads V2, V3, V4, V5, and potentially V6. The third EKG was performed at 4:29 p.m. Again it showed a sinus tachycardia and an ST elevation in lead V2, but Dr. Graber interpreted it as showing that the ST elevations in leads V3, V4, V5, and V6 had resolved.

{¶ 6} Dr. Graber directed Dr. Boraggina to contact Paul Berlacher, M.D., the cardiologist on call for Northwest Ohio Cardiology Consultants, where Mr. Dazley was already a patient.[1] Dr. Graber testified as to what she expected Dr. Boraggina to tell Dr. Berlacher:

> I instructed Dr. Boraggina to tell Dr. Berlacher that we had Mr.
> Dazley, a patient with known cardiac disease who had recent cardiac
> interventions and a recent cardiac arrest, that he was in the emergency

---

[1] Dr. Berlacher was not Mr. Dazley's cardiologist, but he practiced with the same group.

3.

department with pulmonary edema and concern for cardiogenic shock as the patient had become hypotensive.

Dr. Graber did not instruct Dr. Boraggina to tell Dr. Berlacher when he should come see Mr. Dazley, but she anticipated based on what was conveyed to him that Dr. Berlacher would come "soon," and certainly by midnight.

{¶ 7} Dr. Graber was confident that Dr. Boraggina contacted Dr. Berlacher, and this is supported by the department's call logs. But Dr. Boraggina does not remember the substance of their conversation, he made no note in the patient's chart documenting the conversation, and Dr. Berlacher does not recall even having a conversation. Ultimately, Mr. Dazley was not seen by a cardiologist and did not undergo a cardiac catheterization that night.

{¶ 8} At approximately 5:48 p.m., Mr. Dazley was evaluated by an internal-medicine resident, Syed Ashraf, M.D., and admitted to the medical intensive care unit ("MICU"). Not having seen the three EKGs from the E.D. visit, Dr. Ashraf ordered a fourth EKG. Upon reviewing it, he too was concerned about a possible ST elevation in lead V3. He faxed the EKG to Dr. Berlacher and discussed it with him over the telephone. Dr. Berlacher's impression from the EKG ordered by Dr. Ashraf was that there was no STEMI, that Mr. Dazley had suffered a non-ST elevation myocardial infarction, and that there was no urgent need to activate the cath lab. Dr. Ashraf and Dr. Berlacher discussed how best to address Mr. Dazley's low blood pressure. Dr. Berlacher

4.

suggested prescribing Dopamine. As with his conversation with Dr. Boraggina, Dr. Berlacher does not recall discussing Mr. Dazley's care with Dr. Ashraf.

{¶ 9} On October 3, 2012, Mr. Dazley was evaluated by a cardiologist. It was determined that his stent was blocked, requiring immediate surgery. Blood flow was not restored quickly enough, however, and Mr. Dazley suffered significant heart damage. A new stent was placed, and several days later, Mr. Dazley was transferred to the University of Michigan. He remained there until his death on June 5, 2013.

{¶ 10} Mr. Dazley's estate, administered by his wife, sued many of the medical providers involved in his care in Lucas County case No. CI0201401864. During the pendency of that case, Dazley settled with some providers and voluntarily dismissed others before dismissing the case in its entirety without prejudice under Civ.R. 41(A)(1)(a). She refiled the present action against only Drs. Boraggina and Berlacher and their employers. Dazley ultimately resolved her claims against Dr. Berlacher.

{¶ 11} On July 24, 2017, Dr. Boraggina moved for summary judgment. In a decision journalized on November 21, 2017, the trial court granted Dr. Boraggina's motion. Dazley appealed and assigns a single error for our review:

> THE TRIAL COURT ERRED IN GRANTING DEFENDANTS'
> MOTION FOR SUMMARY JUDGMENT.

## II. Standard of Review

{¶ 12} Appellate review of a summary judgment is de novo, *Grafton v. Ohio Edison Co.,* 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996), employing the same

5.

standard as trial courts. *Lorain Natl. Bank v. Saratoga Apts.,* 61 Ohio App.3d 127, 129, 572 N.E.2d 198 (9th Dist.1989). The motion may be granted only when it is demonstrated:

> (1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor. *Harless v. Willis Day Warehousing Co.,* 54 Ohio St.2d 64, 67, 375 N.E.2d 46 (1978), Civ.R. 56(C).

{¶ 13} When seeking summary judgment, a party must specifically delineate the basis upon which the motion is brought, *Mitseff v. Wheeler*, 38 Ohio St.3d 112, 526 N.E.2d 798 (1988), syllabus, and identify those portions of the record that demonstrate the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996). When a properly supported motion for summary judgment is made, an adverse party may not rest on mere allegations or denials in the pleadings, but must respond with specific facts showing that there is a genuine issue of material fact. Civ.R. 56(E); *Riley v. Montgomery*, 11 Ohio St.3d 75, 79, 463 N.E.2d 1246 (1984). A "material" fact is one which would affect the outcome of the suit under the applicable substantive law. *Russell v. Interim Personnel, Inc.*, 135 Ohio App.3d 301, 304, 733 N.E.2d 1186 (6th Dist.1999); *Needham v. Provident Bank*, 110 Ohio App.3d 817, 826,

6.

675 N.E.2d 514 (8th Dist.1996), citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 201 (1986).

### III. Law and Analysis

{¶ 14} Central to the trial court's summary judgment decision and to this appeal is the testimony of Dazley's retained emergency-medicine expert, Fred Mushkat, M.D. The trial court held that Dr. Mushkat "made no attempt to articulate a recognized standard of care, if any, applicable to communications between emergency medical providers and cardiologists with whom they consult," and, as such "Mushkat's 2017 criticism of Boraggina's failure to specifically relay the concern of cardiogenic shock, expressly, to Berlacher is not based on an articulated applicable standard of care." It also found that Dr. Mushkat's "2015 deposition testimony raises no question of fact upon which reasonable minds could determine that Boraggina deviated from the applicable standard of care described by Mushkat." Before addressing the propriety of the trial court's conclusions, we must provide additional background concerning Dr. Mushkat's opinions.

### A. Dr. Mushkat testified in 2015 and again in 2017.

{¶ 15} Dr. Mushkat testified twice in this case. The first time was on June 30, 2015, before the Civ.R. 41(A)(1)(a) dismissal, when Drs. Graber, Boraggina, and Berlacher were all parties, and the second time was March 20, 2017, in the refiled action, when only Drs. Boraggina and Berlacher remained parties.[2]

---

[2] Attached to Dazley's refiled complaint was an affidavit of merit in which Dr. Mushkat stated:

7.

{¶ 16} In his 2015 deposition, Dr. Mushkat's criticisms were directed mainly at Dr. Graber, as the attending physician.  He testified that the standard of care required Dr. Graber to either (1) "activate the cath lab and get a cardiologist in to take this patient over in cardiogenic shock with acute anteroseptal myocardial infarction," or (2) "if there were any question and Dr. Berlacher were nearby, to call him up and say 'I have a patient in cardiogenic shock with an EKG that looks like acute myocardial infarction, do you want me to activate the cath lab or can you—are you in the building, can you come over and take a quick look at him?'"  He said that Dr. Graber should have told Dr. Boraggina to "call Dr. Berlacher and tell him he needs to come in here stat to see this patient right now because he's dying on us and it looks like he might be having a heart attack."

{¶ 17} To the extent that he expressed criticisms of Dr. Boraggina in 2015, those criticisms, for the most part, focused on whether he—as a resident—followed the instructions of his attending physician.  He testified in 2015:

> My opinion is this:  That when you have a Resident working under
>
> you, as the Attending Physician it is your responsibility to be – make sure

---

[I]t is my opinion Sara J. Graber, M.D. clearly wanted the Cardiologist, in this case, Paul Berlacher, M.D., to be told during the telephone call between Nicholas A. Boraggina, M.D. and Paul Berlacher, M.D. that "we had a concern for cardiogenic shock," further, based on the above, one could reasonably say that Nicholas A. Boraggina, M.D. failed to relay that specific concern to Paul Berlacher, M.D.  Failure to relay that information to Paul Berlacher, M.D. would be a departure from standard of care by Nicholas A. Boraggina, M.D.  Said departure would also be a cause of Daryl D. Dazley, Sr.'s injuries and resultant death.

8.

that everything is done correctly. And if Dr. Boraggina were merely told to call Dr. Berlacher or call the cardiology service that had been taking care of Mr. Dazley previous to his arrival and just let them know that this patient was in the ED and was going to be admitted, then Dr. Boraggina met an Accepted Standard of Care.

If Dr. Graber were – were to have said to Dr. Boraggina "call the cardiologist and get him in here right away" then Dr. Boraggina did not meet an Accepted Standard of Care. Or if he was stonewalled by the – by the cardiologist, then it would have been up to Dr. Graber to then call the cardiologist and speak to him directly.

If, on the other hand, Dr. Boraggina [sic] said "call the cardiologist and get him in here" and Dr. Boraggina merely called and said "we have a patient that – that we're giving you a courtesy call that's going to be admitted to another service and we just wanted to make sure you knew he was in the hospital" and Dr. Boraggina did not expressly follow Dr. Graber's instructions, then it would be Below an Accepted Standard of Care for him to have done so.

But all in all given the information that's available, I believe that the responsibility was Dr. Graber's with respect to what was said to Dr. Berlacher and in response to Dr. Graber with respect to what was done to admit Mr. Dazley to the Internal Medicine Service. And that under the

guidance of Dr. Graber, Dr. Boraggina acted correctly, then I don't have any criticisms of him.

{¶ 18} In other words, Dr. Mushkat opined that it was Dr. Graber's duty to instruct Dr. Boraggina what to tell Dr. Berlacher, and so long as Dr. Boraggina followed Dr. Graber's instructions, his conduct did not fall below the standard of care. Clearly, however, Dr. Mushkat believed that Dr. Graber's instructions should have made clear that Mr. Dazley needed to be seen immediately.[3]

{¶ 19} Counsel for Dr. Boraggina sought to clarify the limited nature of Dr. Mushkat's criticisms of Dr. Boraggina:

Q: You have no criticisms of Dr. Boraggina as long as Dr. Graber did not give him a specific instruction or an instruction to tell Dr. Berlacher or the cardiologist to come in right away and he failed to carry that out.

A: That's correct, or if she…the rest of the criticism that there are any other hypotheticals would involve Dr. Graber. So my only criticism with Dr. Boraggina would be if she asked him to carry those out and he did not and then was deceitful about it, that would be a criticism.

{¶ 20} The department call logs confirm that Dr. Boraggina did, in fact, call Dr. Berlacher. One of the complications in this case, however, is that while Dr. Boraggina recalled speaking with Dr. Berlacher, he could not recall exactly what he told him. And

---

[3] Dr. Mushkat also opined that Dr. Boraggina violated the standard of care by failing to document his conversation with Dr. Berlacher.

for his part, Dr. Berlacher had *no* recollection of the conversation.  So each physician indicated what his routine or habit would have been under the circumstances.  Dr. Boraggina testified at his deposition:

> I speak to 20, 30 people a day and tell the story of what's going on with the patient.

> If you look under my chief complaint, that's usually how I start the conversation, and tell them, "Gentleman such and such an age presents with" the complaint he's here with.  I would tell something about the hospital course there.  I would discuss vital signs.  I would discuss our diagnostic findings, including EKGs, vital signs.

> And then it's always catered to the specialist.  If I was talking to the pulmonary specialist, I'd tell him about the vent settings; whereas cardiology, I discuss more about the EKGs and the past history here, which was quite significant.

{¶ 21} After the case was refiled, and in response to requests for admission, Dr. Berlacher stated:

> I have no recollection of any involvement in Mr. Dazley's care on October 2, 2012, of having received a call from Dr. Boraggina or of any information as may have been provided in such a call.  *Hypothetically, had I been informed in such a call that there was concern that Mr. Dazley was in cardiogenic shock, I admit that my routine would have been to contact*

11.

*the on call interventional cardiologist* and, had we been convinced that Mr. Dazley was in cardiogenic shock, that either I or the on call interventional cardiologist would have activated the cath lab and that I would have promptly come in to evaluate Mr. Dazley. (Emphasis added.)

Dr. Berlacher further elaborated that if this call had taken place at 5:30 p.m. and he was "convinced" that Mr. Dazley was in cardiogenic shock, "it is probable that Mr. Dazley would have been in the cath lab for treatment sometime after 6:00 p.m. and before 6:30 p.m. on October 2, 2012."

{¶ 22} Dr. Mushkat was re-deposed in 2017, following Dr. Graber's dismissal from the case. At this point his focus shifted. While he confirmed that he stood by the opinions he expressed in 2015, his criticisms of Dr. Boraggina were more pointed and centered around his failure to communicate to Dr. Berlacher exactly what Dr. Graber instructed him to say: that "there was a concern that [Mr. Dazley] may be in cardiogenic shock because he had become hypotensive." Dr. Mushkat testified:

[O]ne expects that the resident does exactly what the attending physician tells him or her to do and that that person goes ahead and follows through in exactly that fashion, but under these circumstances we don't know what happened, so there's every bit of compelling information from Dr. Graber that she did tell Dr. Boraggina exactly what to say and that he didn't – he didn't obviously convey the urgency to the cardiologist that led

to the circumstances causing the neglect that he received from a cardiology point of view up until it was too late.

{¶ 23} So in 2015, Dr. Mushkat testified that Dr. Boraggina, as the resident, was required to follow his attending physician's instructions. His testimony was clear that *if* Dr. Graber told Dr. Boraggina to get Dr. Berlacher in right away—which indisputably did not happen—and Dr. Boraggina failed to convey this to Dr. Berlacher, his conduct fell below the standard of care. In 2017, Dr. Mushkat's opinions more precisely criticized Dr. Boraggina's failure to communicate Dr. Graber's *exact* words: "concern for cardiogenic shock."

### B. Dr. Boraggina moves for summary judgment and to limit Dr. Mushkat's opinions.

{¶ 24} Dr. Boraggina moved for summary judgment in the first-filed case, but Dazley voluntarily dismissed her complaint before the trial court ruled on the motion. He filed a second motion for summary judgment on July 24, 2017. He included in his second motion a motion in limine to limit Dr. Mushkat's testimony.

{¶ 25} Dr. Boraggina claimed that Dr. Mushkat departed from the opinions he expressed in his 2015 deposition when he testified in the refiled case in 2017. He maintained that new, inconsistent opinions expressed during Dr. Mushkat's second deposition could not be used to create a genuine issue of material fact to defeat his motion for summary judgment.

13.

{¶ 26} Dr. Boraggina also argued that he had documented in Mr. Dazley's chart that the patient was tachycardic, hypotensive, in severe respiratory distress, and appeared ill with diffuse rales—descriptors that Dr. Mushkat conceded in his 2015 deposition are the "definition" of cardiogenic shock. Dr. Boraggina insisted that it was unnecessary to use the explicit phrase "cardiogenic shock" because by relaying the information contained in the chart—as was his habit—he effectively communicated to Dr. Berlacher that there was a concern for cardiogenic shock.

{¶ 27} Finally, Dr. Boraggina argued that even if he failed to communicate the concern for cardiogenic shock, the failure to do so had no effect on the causation of Mr. Dazley's death because Mr. Dazley was not in cardiogenic shock in the E.D.

{¶ 28} The trial court found that "Mushkat's 2015 deposition testimony raises no question of fact upon which reasonable minds could determine that Boraggina deviated from the applicable standard of care described by Mushkat." This was largely based on Dr. Graber's testimony that she did not instruct Dr. Boraggina to tell Dr. Berlacher when to come in. The court also found that Dr. Boraggina's testimony as to what his habit would have been in communicating with a specialist could properly be considered under Evid.R. 406, and it held that Dazley "point[ed] to no evidence, nor does the Court see any within the record, that raises a reasonable inference that Boraggina acted outside of his routine on the day in question."

{¶ 29} As to the purported failure to relay the concern for cardiogenic shock, the trial court found that "Mushkat made no attempt to articulate a recognized standard of

14.

care, if any, applicable to communications between emergency medical providers and cardiologists with whom they consult," and, as such "Mushkat's 2017 criticism of Boraggina's failure to specifically relay the concern of cardiogenic shock, expressly, to Berlacher is not based on an articulated applicable standard of care." In any event, it concluded, the facts recorded in the chart and relayed to Dr. Berlacher conveyed this concern despite the lack of the express use of the phrase. The court granted the motion for summary judgment.

{¶ 30} The court did not rule on the motion in limine to limit Dr. Mushkat's testimony. In a separate order, it deemed the motion moot based on its summary judgment decision.

{¶ 31} Although termed somewhat differently by the parties, it is our view that the following issues concerning Dr. Mushkat's opinions must be addressed in resolving the parties' arguments on appeal:

- Did Dr. Mushkat articulate a recognized, applicable standard of care?

- Did Dr. Mushkat contradict his 2015 opinions during his 2017 deposition when he stated that Dr. Boraggina violated the standard of care by purportedly failing to communicate to Dr. Berlacher the concern for cardiogenic shock?

- Did a genuine issue of material fact exist concerning whether Dr. Boraggina communicated the concern for cardiogenic shock?

15.

- If Dr. Boraggina did not communicate the concern for cardiogenic shock, is there a genuine issue of material fact whether this had any causative effect on Mr. Dazley's outcome?

**C. Dr. Mushkat sufficiently articulated a recognized standard of care.**

{¶ 32} To prevail on a claim for medical malpractice, the plaintiff must present testimony from a qualified expert establishing the standard of care and that it was not met. *Sylvester v. Siverhus*, 6th Dist. Lucas No. L-02-1084, 2002-Ohio-6688, ¶ 7, citing *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 130, 346 N.E.2d 673 (1976). The "failure to provide the recognized standards of the medical community is fatal to the presentation of a prima facie case of medical malpractice." *Id.*

{¶ 33} The trial court stated in its decision that Dr. Mushkat "made no attempt to articulate a recognized standard of care, if any, applicable to communications between emergency medical care providers and cardiologists with whom they consult." While Dr. Mushkat did not articulate in general terms what must be relayed during a conference between an emergency room physician and a consulting cardiologist, he identified specifically what he believes the standard of care required under the circumstances in *this* case: it required Dr. Graber either to (1) "activate the cath lab and get a cardiologist in to take this patient over in cardiogenic shock with acute anteroseptal myocardial infarction," or (2) "if there were any question and Dr. Berlacher were nearby, to call him up and say 'I have a patient in cardiogenic shock with an EKG that

looks like acute myocardial infarction, do you want me to activate the cath lab or can you—are you in the building, can you come over and take a quick look at him?'"

{¶ 34} As it relates to Dr. Boraggina, however, Dr. Mushkat placed no responsibility on him to decide what information to provide to Dr. Berlacher. Dr. Mushkat's opinion of what the standard of care required of Dr. Boraggina—a resident working under the supervision of an attending physician—was very straightforward: it required Dr. Boraggina to relay to Dr. Berlacher what his attending physician told him to relay. Thus, we conclude (1) that Dr. Mushkat *did* articulate a standard of care relating to the communication between the emergency-room physician and the cardiologist, but (2) he also articulated a narrower standard of care applicable here requiring a resident to carry out the instructions of his attending physician.

**D. The trial court considered Dr. Mushkat's 2017 testimony, implicitly determining that it did not "contradict" the opinions he expressed in his 2015 deposition.**

{¶ 35} Dr. Boraggina claims that the opinions expressed in Dr. Mushkat's 2017 deposition—and in his affidavit of merit[4]—conflicted with those expressed in his 2015 deposition and cannot be considered. Along with his motion for summary judgment, he

---

[4] Dazley claims that the trial court ignored Dr. Mushkat's affidavit of merit, but Civ.R. 10(D)(2)(d) provides that "[a]n affidavit of merit is required to establish the adequacy of the complaint and shall not otherwise be admissible as evidence or used for purposes of impeachment." It may not be used as summary judgment evidence. *Ramos v. Khawli*, 181 Ohio App.3d 176, 2009-Ohio-798, 908 N.E.2d 495, ¶ 86 (7th Dist.). Thus the trial court did not err in failing to consider the affidavit of merit.

17.

moved in limine to exclude these purportedly conflicting opinions. The trial court found the motion moot in light of its summary-judgment ruling.

{¶ 36} The Ohio Supreme Court recognized in *Pettiford v. Aggarwal*, 126 Ohio St.3d 413, 2010-Ohio-3237, 934 N.E.2d 913, ¶ 38 that "an affidavit of a retained, nonparty expert contradicting the former deposition testimony of that expert and submitted in opposition to a pending motion for summary judgment does not create a genuine issue of material fact to prevent summary judgment unless the expert sufficiently explains the reason for the contradiction." This principle is equally applicable where the conflicting information is presented in a more recent deposition. *Carnes v. Gordon Food Serv.*, 2d Dist. Clark No. 06-CA-86, 2007-Ohio-2350, ¶ 47 ("Just as a party cannot use an affidavit to contradict prior deposition testimony, we discern no reason why a plaintiff should be permitted to use more recent deposition testimony to contradict prior deposition testimony.").

{¶ 37} But where more recent testimony merely explains, supplements, or clarifies the earlier testimony rather than contradicts it, it may be considered to create a genuine issue of material fact sufficient to defeat a motion for summary judgment. *Purcell v. Norris*, 10th Dist. Franklin No. 04AP-1281, 2006-Ohio-1473, ¶ 12, citing *Medina v. Harold J. Becker Co., Inc.,* 163 Ohio App.3d 832, 2005-Ohio-5438, 840 N.E.2d 1112, ¶ 27. Whether an expert's more recent testimony contradicts his or her prior deposition testimony is a question of fact for the trial court to resolve. *Duck v. Cantoni*, 4th Dist. Washington No. 11CA20, 2013-Ohio-351, ¶ 32, citing *Pettiford* at ¶ 40. So too is the

18.

issue of whether a sufficient explanation has been offered for the conflict. *Pettiford* at ¶ 40.

{¶ 38} At one point, the trial court stated that Dr. Mushkat's 2017 deposition contained "newly-expressed criticisms." Other times it stated that Dr. Mushkat had "revisited his 2015 testimony" and "changed his focus." On their face, it is not entirely clear whether these comments constituted a finding by the trial court that Dr. Mushkat's 2017 testimony "contradicted" his 2015 deposition without sufficient explanation (which would preclude its use to defeat summary judgment), or an observation that Dr. Mushkat merely "explained, supplemented, or clarified" his prior testimony (which would permit the court to consider his 2017 testimony when ruling on summary judgment). But, considering the trial court's opinion as a whole, it appears to be the latter. While the trial court did not explicitly address the issue, it considered Dr. Mushkat's 2017 deposition and analyzed the facts as they relate to his later testimony—which implicitly resolved the issue within the context of the summary-judgment ruling, and rendered the pending motion in limine moot.

{¶ 39} We agree with, and we find no error in, the trial court's consideration of Dr. Mushkat's 2017 deposition testimony. In 2015, Dr. Mushkat testified generally about a resident's duty to follow the instructions of his attending physician and opined that Dr. Boraggina acted within the standard of care if he followed those instructions. It could properly be concluded that his 2017 testimony—which was focused on what Dr. Graber specifically instructed Dr. Boraggina to say—merely "explained, supplemented, or

19.

clarified" his prior testimony and, therefore, permitted the trial court to consider that testimony on summary judgment.

### E. There exists a question of fact concerning whether Dr. Boraggina acted outside his routine practice.

{¶ 40} The trial court found that Dr. Boraggina's testimony as to what his habit would have been in communicating with a specialist could properly be considered under Evid.R. 406. It further found that Dazley "point[ed] to no evidence, nor does the Court see any within the record, that raises a reasonable inference that Boraggina acted outside of his routine on the day in question."

{¶ 41} Dr. Boraggina did not recall what he told Dr. Berlacher, but he described his routine in communicating with consulting physicians. Under Evid.R. 406, "[e]vidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice." "A habit is defined as a person's regular practice of meeting a particular kind of situation with a specific type of responsive conduct." *Mulford-Jacobs v. Good Samaritan Hosp.*, 1st Dist. Hamilton No. C-950634, 1996 Ohio App. LEXIS 5210, *6 (Nov. 20, 1996), citing McCormick, Evidence, Section 195 at 825 (4th Ed.Strong Ed.1992). To be admissible as evidence of habit, the occurrence of the stimulus and the responsive behavior must occur frequently enough to constitute a

20.

pattern. *Id.* at *8. A sufficient foundation must be provided for the admission of habit evidence. *Cannell v. Rhodes*, 31 Ohio App.3d 183, 185, 509 N.E.2d 963 (8th Dist.1986).

{¶ 42} Here, Dr. Boraggina testified that he has conversations with consulting physicians like Dr. Berlacher 20-30 times per day, and he always conducts the conversations the same way. He communicates the patient's chief complaint, age, hospital course, vital signs, and diagnostic findings, including EKGs, and then tailors the rest of the information depending on the specialist he is consulting. The trial court accepted this as proper evidence of habit under Evid.R. 406, and we find no error in its conclusion. But this leaves two factual questions to be answered: (1) Was the information that Dr. Boraggina claims to have communicated as part of his normal practice sufficient to alert Dr. Berlacher to the concern for cardiogenic shock? and (2) Did Dazley submit any evidence that was sufficient to create a genuine issue of material fact regarding whether Dr. Boraggina, in fact, followed his normal practice in this case?

{¶ 43} As to the first question, Dr. Mushkat testified in 2015 that "in the Physical Examination * * * put in the record by Dr. Boraggina, he infers [sic] cardiogenic shock by saying that 'the patient was tachycardic, hypotensive, in severe respiratory distress, appears ill with diffuse rales.' All of those would be a definition of cardiogenic shock, but he doesn't use those words." He said that although the words "cardiogenic shock" are not used anywhere in the chart, "[i]t's inferred [sic], but not – not explicitly used."

21.

{¶ 44} In addition to this, Drs. Graber and Boraggina testified that Milrinone—a medication that can be used to treat cardiogenic shock—was ordered for Mr. Dazley. While Dr. Boraggina is listed as the ordering physician, both he and Dr. Graber testified that it is not a medication that either of them have ever ordered; they assume that Dr. Berlacher recommended Milrinone.

{¶ 45} Also, Dr. Berlacher's retained cardiology expert, Douglas Westveer, M.D., was asked at his deposition whether the concern for cardiogenic shock should have been relayed to the consulting cardiologist. He testified that "[e]nough clinical information should be shared, a reasonable cardiologist could draw a conclusion from that information as to whether there's a reasonable probability for that diagnosis."

{¶ 46} Assuming that Dr. Boraggina relayed to Dr. Berlacher the information he said is his habit to relay, the testimony of Drs. Mushkat and Westveer supports the trial court's conclusion that the "fact[s] recorded in Boraggina's chart constituted a 'definition of' cardiogenic shock, whether or not Boraggina expressly used that phrase." Thus, we conclude, as did the trial court, that the information that Dr. Boraggina claims to have communicated to Dr. Berlacher would have been sufficient to alert Dr. Berlacher to the concern for cardiogenic shock.

{¶ 47} Turning to the second question, whether Dazley submitted any evidence sufficient to create a genuine issue of material fact regarding whether Dr. Boraggina actually relayed the appropriate information that he claims to have conveyed, the trial court found that Dazley "point[ed] to no evidence, nor does the Court see any within the

22.

record, that raises a reasonable inference that Boraggina acted outside of his routine on the day in question, leaving a question of fact."

{¶ 48} The habit evidence offered by Dr. Boraggina was admissible, but it is just that—evidence. If uncontroverted, it could be concluded—based on this evidence alone—that no genuine issue of material fact exists as to what was conveyed to Dr. Berlacher. But Dazley offered competing evidence in the form of Dr. Berlacher's responses to requests for admission. Dr. Berlacher described what *his* routine would have been had he been advised that Mr. Dazley was in cardiogenic shock: he would have contacted the interventional cardiologist. He stated:

> I have no recollection of any involvement in Mr. Dazley's care on
> October 2, 2012, of having received a call from Dr. Boraggina or of any
> information as may have been provided in such a call. Hypothetically, had
> I been informed in such a call that there was concern that Mr. Dazley was
> in cardiogenic shock, I admit that my routine would have been to contact
> the on call interventional cardiologist and, had we been convinced that Mr.
> Dazley was in cardiogenic shock, that either I or the on call interventional
> cardiologist would have activated the cath lab and that I would have
> promptly come in to evaluate Mr. Dazley.

{¶ 49} The evidence is clear that Dr. Berlacher did not contact the interventional cardiologist, thus an issue of fact exists: either Dr. Boraggina followed his usual practice when he discussed Mr. Dazley's care with Dr. Berlacher, and Dr. Berlacher failed to

23.

follow his normal practice of consulting the interventional cardiologist, *or* Dr. Berlacher did not consult the interventional cardiologist because Dr. Boraggina failed to follow his normal practice of relaying all pertinent information from Mr. Dazley's chart, thus failing to relay the concern for cardiogenic shock as instructed by Dr. Graber.

{¶ 50} "Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, *written admissions*, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." (Emphasis added.) Civ.R. 56(C). Here, the depositions and written admissions reveal that there *is* a genuine issue of material fact. *See Everhart v. Coshocton Cty. Mem. Hosp.*, 10th Dist. Franklin No. 12AP-75, 2013-Ohio-2210, ¶ 67 (finding genuine issue of material fact where physician testified that he did not receive radiology reports but hospital staff claimed reports would have been delivered to him in the ordinary course of the hospital's routine practice and procedure); *Burris v. Lerner*, 139 Ohio App.3d 664, 671, 745 N.E.2d 466 (8th Dist.2000) (finding that one physician's testimony as to his custom and practice of calling with test results sufficed to controvert second physician's testimony that she received no such call). We must, therefore, disagree with the trial court's conclusion to the contrary.

{¶ 51} Dr. Boraggina acknowledges the holdings in *Everhart* and *Burris*. He argues, however, that "[i]n the absence of a clear denial of a phone call from Dr. Boraggina, which was confirmed by the medical records, Dr. Berlacher's admission does

24.

not create a conflict with the evidence of Dr. Boraggina's habit and practice." We disagree. Dr. Berlacher need not dispute that a phone call occurred in order to dispute that the information at issue was relayed during that phone call. Given that there was no evidence to suggest that an interventional cardiologist was called, Dr. Berlacher's response to the request for admission is sufficient to create a genuine issue of material fact to dispute Dr. Boraggina's contention that he acted in conformity with his habit in consulting with specialists.

### F. A genuine issue of material fact remains as to causation.

{¶ 52} Finally, Dr. Boraggina argues that it is not material whether Dr. Berlacher was told that there was a concern for cardiogenic shock because both parties' "cardiology experts have opined there likely was no cardiogenic shock in the ER, and a concern for cardiogenic shock was inferred [sic] or included on the differential, meaning [Mr. Dazley's] course of treatment would not have been altered."

{¶ 53} Amer Ardati, M.D., a cardiologist retained by Dazley, indicated that Mr. Dazley could not "definitively" be said to be in cardiogenic shock until he left the E.D. Dr. Westveer testified similarly that he would not conclude that Mr. Dazley "was certain" to have been in cardiogenic shock while in the E.D. Having said this, Drs. Graber and Boraggina—both of whom actually saw Mr. Dazley—testified that he *was* in cardiogenic shock while in the E.D. Dr. Graber testified:

> Q: [W]hat in your opinion was Mr. Dazley's condition when he left the emergency room and was taken to the intensive care unit?

25.

A: My opinion was that he remained critically ill in pulmonary edema with signs of cardiogenic shock.

Dr. Boraggina testified:

Q: Was the patient in cardiogenic shock?

A: Of course.

{¶ 54} Thus, the opinions of the retained expert cardiologists that cardiogenic shock was not "certain" or "definitive" until Mr. Dazley left the E.D. do not demonstrate the absence of a genuine issue of material fact given the testimony of Mr. Dazley's treating physicians.

{¶ 55} Accordingly, we conclude that the trial court erred in granting summary judgment to Dr. Boraggina. We find Dazley's sole assignment of error well-taken.

## IV. Conclusion

{¶ 56} Dazley offered expert medical testimony delineating the standard of care for both the attending and resident emergency department physicians as related to the facts of this case. Moreover, while Dr. Boraggina offered proper habit evidence in support of his motion for summary judgment, Dazley offered competing evidence of the routine of the on-call cardiologist, thereby creating a genuine issue of material fact preventing summary judgment in Dr. Boraggina's favor. Finally, factual issues remain to be resolved concerning causation.

26.

**{¶ 57}** We, therefore, find Dazley's sole assignment of error well-taken. We reverse the November 21, 2017 judgment of the Lucas County Court of Common Pleas and remand for proceedings consistent with this decision. The costs of this appeal are assessed to Dr. Boraggina under App.R. 24.

Judgment reversed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

_____
JUDGE

James D. Jensen, J.

Christine E. Mayle, P.J.          _____
CONCUR.                                          JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions. Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.